*In re* RFF

Docket No. 221581. Submitted April 5, 2000, at Lansing. Decided August 15, 2000, at 9:15 A.M. Leave to appeal denied, 463 Mich 894.

A petition was filed in the Family Division of the Bay Circuit Court to determine whether LAF was the father of RFF and, if LAF was found to be the father of RFF, to determine whether LAF's parental rights should be terminated. RFF was born out of wedlock to BJF, who had consented to giving up her parental rights to RFF so that the child could be placed for adoption. LAF and BJF were high school students when BJF became pregnant. On several occasions during the winter and early spring of 1999, BJF told LAF, in response to his questions, that she was not pregnant. However, on April 14, 1999, BJF told LAF that she was pregnant, that he was the father of the child, and that she planned to put the baby up for adoption. LAF seemed to be in agreement with the adoption plan at that time, as he seemed to be again about two weeks later when BJF called him to find out if he had received the paperwork from the adoption agency. On May 10, 1999, LAF and his mother went to the adoption agency with the intent to sign the papers necessary to consent to the adoption; however, upon learning that the child had been born the previous day, LAF became upset and left without signing the adoption consent papers. A few days later, LAF met with a worker for the adoption agency and expressed a wish to see the baby. LAF saw RFF when the child was eight days old and, thereafter, informed the agency of his desire to keep his son. LAF testified that while the adoption agency worker initially seemed to indicate a willingness to assist him in getting custody of the child, telling him that he did not need a lawyer and the medical costs were not an issue because the prospective adoptive parents were paying all the bills, the worker's demeanor changed once LAF indicated a desire to keep RFF. It was undisputed that LAF did not send any money to support BJF during the pregnancy or to support either BJF or RFF after the birth of RFF. Following an evidentiary hearing, the court, Karen A. Tighe, J., held that this matter should be decided under the provisions of subsection 1 of § 39 of the Adoption Code, MCL 710.39(1); MSA 27.3178(555.39)(1), which allows the court to terminate the rights of a putative father to a child if it finds that it would not be in the best interests of the child

to grant custody to the putative father. The court, after making findings concerning the relevant factors set forth in MCL 710.22(f); MSA 27.3178(555.22)(f), determined that it was in the best interests of the child to terminate LAF's parental rights. LAF appealed.

The Court of Appeals *held*:

1. LAF asserts that the court erred in deciding this matter under the provisions of subsection 1 of § 39, rather than the provisions of subsection 2 of § 39, MCL 710.39(2); MSA 27.3178(555.39)(2), which provides that the parental rights of a putative father who has established a custodial relationship or has provided regular support for either the mother or the child are subject to termination under the provisions of the Juvenile Code, MCL 712A.1 *et seq.*; MSA 27.3178(598.1) *et seq.* Although LAF admits that he did not provide any care or support for RFF after the child's birth and did not provide any support to BJF during her pregnancy, LAF asserts that he should come under the provisions of subsection 39(2), arguing that he was thwarted in his ability to satisfy the care or support conditions of subsection 39(2) by BJF's concealment of her pregnancy until less than a month before the child's birth and by the adoption agency misleading him by assurances that all the costs were being paid by the prospective adoptive parents.

2. In *In re Dawson*, 232 Mich App 690 (1998), the Court considered whether a father's rights should be determined under subsection 39(2) where a mother thwarts a putative father's participation in the pregnancy by the concealment from the father of the fact of the pregnancy and the father's attendant obligations. Although expressing concern that under the statute as written a father was denied the protections afforded by subsection 39(2) under circumstances where the father was not given a reasonable opportunity to satisfy the care or support conditions set forth in that subsection, the *Dawson* Court nevertheless held that the determination of the putative father's parental rights under such circumstances were controlled by the provisions of subsection 39(1).

3. LAF argues that the September 18, 1998, amendment by 1998 PA 94 of subsection 39(2), which added the language that the support or care was to be "regular and substantial" and "in accordance with the putative father's ability to provide such support or care," made the holding of the *Dawson* Court concerning the intent and operation of subsection 39(2) before its amendment inapposite in this case. There is nothing in the legislative history of 1998 PA 94 to suggest that the Legislature considered the situation presented in the present case or intended by the amended language to create an exception to the care or support requirement of subsection 39(2) where a father has been deceived about a pregnancy. Accordingly,

the trial court properly found that the question of LAF's parental rights should be determined pursuant to the provisions of subsection 39(1) because LAF had not provided substantial and regular care or support within the meaning of subsection 39(2).

4. Following the evidentiary hearing, the trial court made findings with respect to the relavent factors set forth in MCL 710.22(f); MSA 27.3178(555.22)(f) and, after considering all those relevant factors, found that it was not in the best interests of the child for the father to have custody of the child. Although some of the particular findings of the trial court may be questionable, there is no definite and firm conviction that the trial court made a mistake. Accordingly, the record fails to establish that the trial court clearly erred in its finding of the best interests of the child.

5. LAF asserts that he was denied equal protection of the law because he, as the putative father of a child that was subject to adoption, had his parental rights terminated under the provisions of the Adoption Code on the basis of a finding that the termination was in the best interests of the child, while a father of a child that was not subject to adoption would have had his parental rights terminated under the provisions of the Juvenile Code only on a finding of neglect or abuse. Because LAF never established a custodial, personal, or financial relationship with his child, LAF does not possess the fundamental right of parenthood that will evoke a strict scrutiny review of his equal protection claim. Rather, his equal protection claim is subject to the rational basis standard of review.

6. A rational basis exists for providing an expeditious means of determining and terminating the parental rights of putative fathers under the Adoption Code: the need to provide prompt legal proceedings to assure that an adoptee is free for adoptive placement at the earliest possible time. Although the Adoption Code provides for termination of a putative father's parental rights upon a finding that the termination is in the best interests of the child, the termination of parental rights is available on that basis only where the putative father has contributed neither care nor support. There is a legitimate reason to treat fathers who have contributed care or support differently from those who have not. Accordingly, the equal protection claim on this basis must fail.

7. A rational basis exists for treating the termination of the parental rights of a mother of a child born out of wedlock differently from the termination of the parental rights of a putative father who has provided neither care nor support. Accordingly, the gender-based classification created by § 39 of the Adoption Code is substantially related to the Adoption Code's legitimate objective and creates no valid gender-based equal protection challenge.

Affirmed.

WILDER, P.J., dissenting, stated that language of the 1998 amendment of subsection 39(2) by the addition of the language that the required care or support be "in accordance with the putative father's ability to provide such care or support" evidences a clear legislative intent to ameliorate the care or support requirement of subsection 39(2) in cases like this where concealment and faulty advice may have contributed to the putative father's failure to provide care or support. The matter should be remanded to the trial court for a determination whether the circumstances in this case prevented the putative father from providing care or support. Moreover, even if this matter were properly decided under the best interests standard of subsection 39(1), the decision in this matter should be reversed because the trial court failed to consider certain relevant facts and, accordingly, clearly erred in its determination that the termination of the putative father's parental rights was in the best interests of the child.

1. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — ADOPTION — PUTATIVE FATHERS — SUPPORT OR CARE.

Neither the concealment from a putative father of the fact of a pregnancy nor faulty advice to a putative father by an adoption agency concerning the need of the putative father to provide care or support for the mother or the child will relieve a putative father from the care or support requirement of subsection 2 of § 39 of the Adoption Code; if a putative father does not provide care or support to the mother or the child during or after the birth of the child, even if the failure to provide such care or support is the result of the concealment of the pregnancy or misinformation concerning the need to provide such care or support, the determination of the parental rights of the putative father, including the determination whether to terminate the putative father's parental rights, is to be made pursuant to the best interests of the child standard of subsection 1 of § 39 of the Adoption Code (MCL 710.39[1], [2]; MSA 27.3178[555.39][1], [2]).

2. PARENT AND CHILD — TERMINATION OF PARENTAL RIGHTS — ADOPTION CODE — EQUAL PROTECTION.

A putative father who has never established a custodial, personal, or financial relationship with his child does not possess the fundamental right of parenthood; any equal protection challenge by such a putative father is reviewed under the rational basis test rather than the strict scrutiny test; the determination whether to terminate the parental rights of a putative father who has provided neither care nor support of either a mother or her child pursuant to

subsection 39(1) of the Adoption Code on the basis that the termination of parental rights is in the best interests of the child does not deny the putative father equal protection of the law either with respect to other fathers not so situated or with respect to the mothers of children born out of wedlock (MCL 710.39[1]; MSA 27.3178[555.39][1]).

*Lynch, Gallagher, Lynch & Martineau, P.L.L.C.* (by *Jennifer M. Galloway*), for LAF, putative father.

*Kemp, Klein, Umphrey & Endelman, P.C.* (by *Lauran F. Howard*) and *Currie Kendall Polasky Meisel, PLC* (by *Julia Close*), for BJF, mother.

Before: WILDER, P.J., and McDONALD and DOCTOROFF, JJ.

McDONALD, J. Appellant, LAF, appeals as of right the trial court's order terminating his parental rights to his son, RFF, pursuant to § 39 of the Adoption Code, MCL 710.39; MSA 27.3178(555.39). We affirm.

This case is troubling. We set forth the complete factual context to emphasize the numerous issues we believe the Legislature should consider in examining the statute at issue.

The child involved in this case was conceived out of wedlock while the parties were in high school. The parties dated for approximately a year, beginning in the fall of 1997. Their dating relationship ended in September 1998. According to appellant, in November 1998 appellee, BJF, told him that she had failed to have a menstrual period. Appellee recalled this disclosure being made in January 1999. In any event, appellee admits that she lied to appellant several times when he confronted her about rumors at school that she was pregnant. Several times she adamantly denied that she was pregnant. However, on April 14,

1999, appellee telephoned appellant and told him that she was pregnant, that he was the father, and that she planned to put the baby up for adoption through an adoption agency. Appellee was planning to attend college in the fall. Appellant indicated that he had plans to enter the Marine Corps and wanted to complete boot camp that summer. Appellant appeared to be in agreement with the adoption plan at that time. Appellee told appellant that he would be receiving paperwork from the adoption agency. She telephoned him again about two weeks later to find out whether he had received the paperwork. They again discussed her plans for college and his plans for boot camp. As far as appellee knew, appellant was still in agreement with the adoption plan. They had not spoken directly since that second telephone conversation.

RFF was born May 9, 1999, and was immediately turned over to the prospective adoptive parents.[1] Appellant was not informed about the birth at that time. He claimed that he did not know when the baby was due.

Appellant and his mother went to the adoption agency the day after the baby was born. They were going to the agency with plans for appellant to sign the papers necessary to consent to the adoption. However, when appellant learned that the baby had been born the previous day, he became upset and changed his decision. Appellant refused to sign the consent, and he and his mother left the agency. A few days later appellant contacted the adoption agency and arranged another meeting. At the meeting, he told

---

[1] This case involves a direct placement adoption in which appellee placed the child with a specific couple.

the agency worker that he wanted to see the baby. Appellant was able to see RFF once when he was eight days old. This confirmed appellant's desire to keep his son. Appellant informed the agency that he wanted to keep RFF. He testified that up until that point he felt that the adoption agency worker was going to assist him in getting custody of RFF. Appellant claimed that the agency worker told him that he had a good chance of getting to keep the baby and that they did not need to get a lawyer. He also testified that he was told cost was not an issue because the prospective adoptive parents were paying all the bills. However, appellant testified that when he told the worker that he wanted to keep RFF, her demeanor changed. She talked about the trauma to RFF if removed from the prospective adoptive parents and the bonding among the baby and the prospective adoptive parents. At that point, RFF was only about ten days old. Appellant then stopped dealing with the agency. Appellant admitted that he did not send any support money to appellee before or after the baby was born.

On June 25, 1999, the trial court held a hearing on the petition to identify the father and determine or terminate his rights. After determining that appellant was the father of the child,[2] the trial court found that appellant had not provided "substantial and regular support or care" for the purposes of subsection 39(2) of the Adoption Code.[3] The trial court acknowledged

[2] Later, DNA testing confirmed the trial court's determination at the hearing. There was some discussion of whether to adjourn the hearing for the testing to take place, but the trial court reserved its ruling and continued the hearing.

[3] MCL 710.39(2); MSA 27.3178(555.39)(2).

that appellee may have thwarted appellant's participation in the pregnancy and that the adoption agency could have given him better counseling, but concluded that for whatever reason, appellant had not provided support or care and did not fall under subsection 39(2). Accordingly, the trial court continued the hearing to determine whether the best interests of the child would be served by granting custody to appellant or whether appellant's parental rights should be terminated pursuant to subsection 39(1).[4] In a written opinion issued approximately a month after the hearing, the trial court analyzed the best interest factors and found that it was not in the best interest of RFF to award custody to appellant. Accordingly, the trial court entered an order terminating appellant's parental rights.

Appellant first argues the trial court erred in applying subsection 39(1) rather than subsection 39(2) of the Adoption Code. This is a question of law, which we review de novo. *In re Lang*, 236 Mich App 129, 135-136; 600 NW2d 646 (1999).

MCL 710.39; MSA 27.3178(555.39) provides, in pertinent part:

> (1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.

---

[4] MCL 710.39(1);   MSA 27.3178(555.39)(1).

(2) If the putative father has established a custodial relationship with the child or has provided *substantial and regular* support or care *in accordance with the putative father's ability to provide such support or care* for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter [MCL 710.51(6); MSA 27.3178(555.51)(6)] or section 2 of chapter XIIA [MCL 712A.1 *et seq.*; MSA 27.3178(598.1) *et seq.*]. [Emphasis added to reflect amendment by 1998 PA 94, effective September 1, 1998.]

As the Court explained in *In re Barlow*, 404 Mich 216, 229; 273 NW2d 35 (1978):

Section 39 of the code creates two categories of putative fathers and provides different standards for termination of the rights of each. Putative fathers who have established no custodial relationship with the child, and who have provided no support for the mother or child prior to the notice of hearing, may have their parental rights terminated if the court finds, after examining the father's fitness and ability to properly care for the child, "that it would not be in the best interests of the child to grant custody" to him. The parental rights of the second group, those who have established some kind of custodial or support relationship prior to the notice of hearing, are subject to termination only by proceedings under the general jurisdictional provisions of chapter 12A of the Probate Code.

In this case, it is undisputed that appellant has not established a custodial relationship with RFF. It is also undisputed that appellant did not provide any support or care to appellee during her pregnancy or after RFF's birth. Appellant further admits that he has not provided any support or care to RFF since his birth. However, appellant argues that because of the

unique circumstances of this case, he should be considered to come within the provisions of subsection 39(2). Specifically, appellant points to appellee's concealment of her pregnancy until less than a month before RFF's birth as the reason why he could not provide support or care during the pregnancy. In addition, appellant argues that the adoption agency misled him after the child was born by assuring him that the costs were being paid by the prospective adoptive parents, further thwarting his ability to have his rights considered under subsection 39(2).

This Court has previously considered the issue whether the father's rights should be determined under subsection .39(2) where a mother thwarts his participation in the pregnancy in *In re Dawson*, 232 Mich App 690; 591 NW2d 433 (1998). In *Dawson*, the mother told the father she planned to have an abortion, later told him he was not the child's father, and then did not inform him the child was born. *Id.* at 692, 695. This Court held that "because § 39, as written, does not account for such a situation, we must conclude in the instant case that [the father] did not satisfy subsection 39(2)." *Id.* at 696. Accordingly, this Court held the father's rights were properly determined under subsection 39(1). *Id.* at 695.

However, the Legislature amended subsection 39(2) effective September 1, 1998, and in *Dawson*, this Court was interpreting the previous version of the statute. At the time this Court decided *Dawson*, subsection 39(2) provided:

> If the putative father has established a custodial relationship with the child or has provided support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the

hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA. [See *Dawson, supra* at 693.]

The amended statute provides that to come within subsection 39(2), a father must provide *"substantial and regular* support or care *in accordance with the putative father's ability to provide such support or care."* MCL 710.39(2); MSA 27.3178(555.39)(2) (emphasis added).

Appellant argues the statute was amended to address the problem in this case. We disagree.

Statutory interpretation is a question of law that this Court reviews de novo. *In re Schnell,* 214 Mich App 304, 310; 543 NW2d 11 (1995). The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc,* 456 Mich 511, 515; 573 NW2d 611 (1998), *Dawson, supra* at 696. The starting point for determining the Legislature's intent is the specific language of the statute. *House Speaker v State Administrative Bd,* 441 Mich 547, 567; 495 NW2d 539 (1993); *Dawson, supra* at 696. The Legislature is presumed to have intended the meaning it plainly expressed, and when the statutory language is clear and unambiguous, judicial construction is neither required nor permitted. *Rowell v Security Steel Processing Co,* 445 Mich 347, 353; 518 NW2d 409 (1994); *Dawson, supra* at 696. Where the language employed by the Legislature is susceptible to more than one interpretation, judicial construction is justified. *Rowell, supra* at 353. When construing a statute, the court must use common sense and should construe the statute to avoid unreasonable consequences.

*Dawson, supra* at 696. Because the Adoption Code is in derogation of the common law, it must be strictly construed. *Id.*

Appellant argues that the Legislature intended to include fathers who have been deceived about a pregnancy under subsection 39(2) when it added the phrase "in accordance with the putative father's ability to provide such support or care" to the statute. This language does not clearly address the situation presented in this case. At best, the language may be susceptible to multiple meanings. The language could simply address a putative father's financial ability to provide substantial and regular support and care to the mother during pregnancy. The phrase might also be interpreted in a broader sense to encompass the situation in this case. However, even if we view the language as ambiguous, we do not believe the Legislature intended to create a deceived father exception to the requirement that a father provide substantial and regular care and support to the mother during pregnancy in order to come within subsection 39(2).

The legislative history reveals that the Legislature did not consider the situation presented in this case when it amended subsection 39(2). Instead, it appears the statute was amended to raise the amount of support required for a father to have his rights determined under subsection 39(2). The rationale for the amendment was identified as follows in the Senate Legislative Analysis, SB 415, August 26, 1998:

> Some people believe that the standard of providing "support or care" is too low for a putative father to receive a hearing on the termination of his parental rights because even a minimal amount of support or care could be used to justify not having parental rights terminated without a hear-

ing. They contend that, to earn the right to a hearing on his parental rights, a putative father should have to provide "regular and substantial" support or care for the mother during pregnancy or for the mother or the child after the birth.

This sentiment is continued in the arguments supporting the amendment of the bill. *Id.* The arguments opposing the amendment also reflect that the Legislature did not intend to create an exception where a father has been deceived about the pregnancy:

> While the bill's objective may be laudable, it raises concerns about the elimination of the due process rights of a person who made little or no effort to exercise his responsibility of support. The parental rights of such a person may be automatically terminated under the bill because a mother has decided to terminate her parental rights. *Sometimes, a father may not know in advance of a birth that he is about to become a parent. [Id.* (emphasis added).]

Accordingly, we disagree with appellant that the statute was amended in order to address the situation presented in this case.

We believe the trial court properly found that appellant's rights should be determined under subsection 39(1). In reaching this holding, we note that the trial court did consider the fact that appellant was deceived about the pregnancy, but found that it could not assume that if appellant had known of the pregnancy earlier, he would have supported the mother. We agree that the statute does not allow such an assumption to be made. We also note that once appellant knew that he was the father and that RFF had been born, he did not provide support or care to the baby. Although appellant argues that he made an effort to be involved and decide what was best for

the child, this does not constitute substantial and regular support or care for the purposes of subsection 39(2). See *Dawson, supra* at 695 (filing a notice of intent to claim paternity does not constitute support or care under subsection 39[2]).

While we believe that the statute requires the result we have reached in this case, we repeat the concern expressed by this Court in *Dawson, supra* at 695-696. We believe that the Legislature should reexamine § 39 and evaluate under which of the existing subsections, subsection 39(1) or subsection 39(2), it is most appropriate to place a father who has been deceived about a pregnancy and whether it is more appropriate to create a third subsection to address this specific problem. While this Court may feel that it is unfair to consider such a father under subsection 39(1), the Legislature is the appropriate forum for making these types of policy choices.

Next, appellant argues the trial court erred in finding that it was in the best interest of RFF to terminate his parental rights. This Court reviews the trial court's findings of fact for clear error. *In re Cornet,* 422 Mich 274, 277; 373 NW2d 536 (1985); *Lang, supra* at 139.

After hearing testimony on this issue, the trial court made findings on the relevant factors set forth in MCL 710.22(f); MSA 27.3178(555.22)(f).[5]

Under factor i, the trial court found there were no true emotional ties between appellant and RFF in light of the fact that they only had one brief meeting. The trial court also noted that appellant had not expressed love for the child during his testimony and

---

[5] The trial court found that factors iv, vi, viii, ix, and x were not relevant in this matter.

indicated he wanted to keep the child because of feelings of responsibility and obligation.

Factor ii addresses the capacity of the putative father to give the child "love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture" of the child. MCL 710.22(f)(ii); MSA 27.3178(555.22)(f)(ii). Under this factor, the trial court stated that appellant had the capacity to give love and affection as a big brother would and emphasized appellant's inability to express the type of guidance he would give to the child. The trial court also found appellant could not identify the religion he was raised in or explain in what religion he would raise RFF. Moreover, the trial court recognized that appellant would raise the child in his large extended family.

Factor iii assesses the putative father's capacity and disposition to provide the child with "food, clothing, education, permanence, medical care . . . , and other material needs." MCL 710.22(f)(iii); MSA 27.3178(555.22)(f)(iii). The trial court found that appellant could not provide these things on his own because he was still in high school and worked at a low-paying job. Appellant's parents could provide these material things, but could not provide permanence because appellant eventually planned to move out of his parents' home once he was established.

Under factor v, the trial court found that the permanence of appellant's home was unknown because his plans after graduation from high school were not yet established. The trial court also indicated that appellant's parents had "already contemplated that they may keep the baby if [appellant] moves out."

Regarding factor vii, the trial court found that appellant and the baby were in good physical health, but that the appellant's maturity was in question. The trial court considered appellant's admissions that he had a temper, that he had threatened suicide after arguing with the child's mother, that he had punched lockers at school, and that he had been suspended from school once after fighting with another child.

The trial court relied heavily on its lengthy findings under factor xi, "[a]ny other factor considered by the court to be relevant." MCL 710.22(f)(xi); MSA 27.3178(555.22)(f)(xi). Under this factor, the trial court emphasized that appellant's custody plan was in effect a plan to award custody to his parents and that he would not be the primary custodian of the child. The trial court indicated it had an "overwhelming impression" that appellant was "seeking custody to satisfy his parents and fulfill a sense of duty toward them." In addition, the trial court discussed appellant's immaturity and his lack of "any sense of joy or elation in seeking custody."

Upon considering all the relevant factors, the trial court found that it was not in the best interest of the child to award custody to appellant. The trial court indicated that the arrangement of allowing the grandparents to be primary custodians until appellant was ready to assume the responsibility did not provide permanency and that if appellant was viewed independently of his parents, the factors did not favor awarding him custody of the baby.

While we disagree with some of the trial court's findings, we are not left with a definite and firm conviction that the trial court made a mistake. Accordingly, we find no clear error on this record. *Overall v*

*Overall,* 203 Mich App 450, 454; 512 NW2d 851 (1994). The facts of this case are substantially different than those of *In re Barlow, supra,* which appellant cites in support of his position. There, although the appellant was young and unmarried, the record in that case did not "disclose the kind of lack of maturity that would support a finding that [the] appellant [was] unable to properly care for his child." *In re Barlow, supra* at 231. The appellant in *Barlow* had finished school, was working full time, and had his own house. Moreover, appellant's reliance on *Ireland v Smith,* 451 Mich 457; 547 NW2d 686 (1996), is misplaced. Appellant's plan regarding his parents' involvement in the child's life extended beyond merely arranging for day care for the baby. Here, appellant's parents were also going to support him financially and help him make decisions. In this difficult case, we defer to the trial court, which was in a better position to view the witnesses. MCR 2.613(C); *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

Appellant next raises two equal protection challenges to § 39 that he did not raise below. This Court ordinarily will not consider issues raised for the first time on appeal. *Booth Newspapers, Inc v Univ of Michigan Bd of Regents,* 444 Mich 211, 234; 507 NW2d 422 (1993). However, we will consider appellant's unpreserved constitutional claims in this case because no questions of fact exist and it is in the interest of justice to do so. *Great Lakes Division of Nat'l Steel Corp v Ecorse,* 227 Mich App 379, 426; 576 NW2d 667 (1998).

Appellant first claims that subsection 39(1) violates the Equal Protection Clauses of the Michigan and United States Constitutions because it allows his

parental rights to be terminated if it is found to be in the best interest of the child, whereas the parental rights of fathers of children who are not subject to adoption can be terminated only in cases of neglect or abuse pursuant to MCL 712A.19b; MSA 27.3178(598.19b).

Statutes are presumed to be constitutional and must be construed as such unless it is clearly apparent that the statute is unconstitutional. *In re Hamlet (After Remand)*, 225 Mich App 505, 521; 571 NW2d 750 (1997). Equal protection of the law is guaranteed by the federal and state constitutions. US Const, Am XIV; Const 1963, art 1, § 2; *Frame v Nehls*, 452 Mich 171, 183; 550 NW2d 739 (1996). The Michigan and federal Equal Protection Clauses offer similar protection. *Id.* Generally, equal protection requires that persons in similar circumstances be treated similarly. *Thompson v Merritt*, 192 Mich App 412, 424; 481 NW2d 735 (1991). "[I]t is well established that even if a law treats groups of people differently, it will not necessarily violate the guarantee of equal protection." *Doe v Dep't of Social Services*, 439 Mich 650, 661; 487 NW2d 166 (1992). Neither constitution has been interpreted to require absolute equality. *Id.* When legislation is challenged as violative of the equal protection guarantee under either constitution, it is subjected to judicial scrutiny to determine whether the goals of the legislation justify the differential treatment it authorizes. *Id.* at 661-662. The level of scrutiny applied depends on the type of classification created by the statute and the nature of the interest affected by the classification. *People v Pitts*, 222 Mich App 260, 272-273; 564 NW2d 93 (1997).

Appellant argues that we should subject the statute to strict scrutiny in this case because it impinges on the fundamental right of a parent to the care, custody, companionship, and management of his child. See *Doe, supra* at 662; *Reist v Bay Circuit Judge*, 396 Mich 326, 339-342; 241 NW2d 55 (1976). We disagree. The United States Supreme Court has recognized there is a distinction between an established relationship between a parent and a child and the existence of a biological link, with the latter entitled to less constitutional protection than the former. *Lehr v Robertson*, 463 US 248, 261, 266-268; 103 S Ct 2985; 77 L Ed 2d 614 (1983). Where a father has never established a "custodial, personal, or financial relationship" with a child, or has abandoned a child, he does not possess the fundamental right of parenthood. *Id.* at 267-268. It is undisputed that appellant has never established a "custodial, personal, or financial relationship" with RFF. Because a fundamental right is not involved, strict scrutiny is not the appropriate level of scrutiny to evaluate this equal protection challenge. *Doe, supra* at 662. Instead, we will utilize the rational basis standard to review appellant's claim. See *Lehr, supra* at 268, n 27 (concluding that the appellant's equal protection argument based upon the manner in which the statute at issue distinguished among classes of fathers was without merit because the statutory distinction was "rational"); see also *In re ASB*, 293 Ill App 3d 836, 847; 688 NE2d 1215 (1997) (applying the rational basis test to a putative father's equal protection challenge where he had not established any relationship with the child). Under this standard, a statute will not be struck down if the clas-

sification scheme it creates is rationally related to a legitimate governmental purpose. *Id.*

Michigan's Adoption Code was enacted for the following general purpose:

> (a) To provide that each adoptee in this state who needs adoption services receives those services.
>
> (b) To provide procedures and services which will safeguard and promote *the best interests of each adoptee* in need of adoption and which will protect the rights of all parties concerned. If conflicts arise between the rights of the adoptee and the rights of another, *the rights of the adoptee shall be paramount.*
>
> (c) *To provide prompt legal proceedings to assure that the adoptee is free for adoptive placement at the earliest possible time.* [MCL 710.21a; MSA 27.3178(555.21a) (emphasis added).]

Section 22 defines the term "best interests of the adoptee" as "the sum total of the following factors to be considered, evaluated, and determined by the court *to be applied to give the adoptee permanence at the earliest possible date . . . .* " MCL 710.22; MSA 27.3178(555.22) (emphasis added). Appellant contends that there is no child in need of adoption services in this case because he stands ready, willing, and able to take custody of his child. However, appellant's argument discounts the other legitimate purpose of the Adoption Code. The Michigan Supreme Court has stated that "[i]n enacting the Adoption Code, the Legislature sought, *inter alia,* to establish procedures to provide for speedy resolution of disputes concerning a putative father's rights where placement of a . . . child [born out of wedlock] for adoption is sought." *In re Barlow, supra* at 228-229. Certainly, the Adoption Code's aims to promote the

best interest of the child in a prompt and final manner are legitimate.

We also find that the difference in treatment of unwed fathers whose children are subject to adoption and unwed fathers whose children are not subject to adoption is rationally related to the state's legitimate interests in providing for the welfare of children. The difference in treatment is based on different circumstances. When a child is born out of wedlock and there is a dispute regarding whether the child may be placed for adoption, there is an urgent need to determine the parental rights of the unwed father that is not present where adoption is not being considered. We agree with appellee that if § 39 were not available, and trial courts were required to follow MCL 712A.19b; MSA 27.3178(598.19b) in order to terminate a putative father's rights, the adoption process would be much lengthier and costly and the lives of children would be significantly disrupted, often unnecessarily. Because the whereabouts of many putative fathers is often unknown, without § 39, difficulties would arise in time establishing a basis for termination of the putative father's parental rights. Such difficulties would make adoption a less attractive alternative because adoptive parents would be less likely to risk taking an infant into their homes for the period it would take to terminate the putative father's parental rights.

Moreover, subsection 39(2) represents a careful accommodation of the competing interests at stake. Where a putative father meets the requirements of subsection 39(2), he is treated exactly the same as an unwed father whose child is not subject to adoption, i.e., his rights may not be terminated except pursuant

to MCL 712A.19b; MSA 27.3178(598.19b).[6] In this case, if appellant had supported his child after he was born, appellant's parental rights could only have been terminated pursuant to MCL 712A.19b; MSA 27.3178(598.19b). However, appellant did not do so. Accordingly, there is a legitimate reason to treat him differently than fathers that have supported their child and from fathers whose children are not subject to adoption. It was not a violation of appellant's equal protection rights to terminate his parental rights pursuant to subsection 39(1).

Finally, appellant argues the Adoption Code violates the Equal Protection Clauses of the federal and state constitutions because it treats biological mothers and fathers differently before their parental rights are terminated. If a biological mother wants custody of a child, there is no inquiry into the best interest of the child, and absent abuse or neglect, the child would be returned to her upon her filing a petition for return of the child from the temporary placement. In contrast, appellant contends he is treated much differently under the Adoption Code despite the fact that, according to appellant, he "demonstrated that he has the ability to provide food, clothing, shelter and medical care for the child."

Appellant incorrectly asserts that the statute should be subject to strict scrutiny. Gender-based classifications are subject to intermediate scrutiny and, to withstand an equal protection challenge, must serve important governmental objectives and be substantially related to achievement of those objectives. *Lehr*

---

[6] The statute also provides that such a father's rights may be terminated pursuant to MCL 710.51(6); MSA 27.3178(555.51)(6). This section of the Adoption Code addresses stepparent adoptions.

*v Robertson, supra* at 266; *Caban v Mohammed,* 441 US 380, 388; 99 S Ct 1760; 60 L Ed 2d 297 (1979); *Craig v Boren,* 429 US 190, 197; 97 S Ct 451; 50 L Ed 2d 397 (1976). Gender-based classifications will be upheld when men and women are not actually similarly situated in the area covered by the legislation in question and the statutory classification is realistically based on the differences in their situations. *Parham v Hughes,* 441 US 347, 354; 99 S Ct 1742; 60 L Ed 2d 269 (1979).

Appellant's argument fails to recognize that the true distinction created by the statute is the difference between the categories of putative fathers. Once again, we look to subsection 39(2) and the opportunity it provides to putative fathers to have their parental rights terminated only pursuant to MCL 712A.19b; MSA 27.3178(598.19b).[7] It is entirely consistent with the Equal Protection Clause to treat fathers of children born out of wedlock who have nothing beyond a biological link with their children differently than mothers of children born out of wedlock. *Lehr, supra* at 267-268.

In short, mothers and fathers of children born out of wedlock are not similarly situated. *Parham, supra* at 355. There are several differences between mothers and fathers of out of wedlock children, including that the identity of the mother of a child born out of wedlock is rarely in question and that "only a father can by voluntary unilateral action make an illegitimate child legitimate." *Id.* Moreover, the mother of a child born out of wedlock has made the decision to give birth to the child rather than have an abortion and, as

---

[7] See note 6, *supra.*

a result of that decision, has carried the child in her womb for nine months. Accordingly, the gender-based classification created by § 39 is substantially related to the achievement of the Adoption Code's legitimate objective. Appellant's equal protection challenge is without merit.

Affirmed.

DOCTOROFF, J., concurred.

WILDER, P.J. (*dissenting*). I respectfully dissent from the majority opinion affirming the trial court's termination of appellant's parental rights to his son, RFF, pursuant to subsection 39(1) of the Adoption Code, MCL 710.39(1); MSA 27.3178(555.39)(1).

The Adoption Code, MCL 710.21 *et seq.*; MSA 27.3178(555.21) *et seq.*, establishes procedures to safeguard and promote the best interests of the adoptee and to provide for speedy resolution of disputes concerning a putative father's rights where placement of a child for adoption is sought. *In re Barlow*, 404 Mich 216, 228-229; 273 NW2d 35 (1978); *In re Lang*, 236 Mich App 129, 136; 600 NW2d 646 (1999). The Adoption Code also provides substantive standards for determining when it is appropriate to terminate a putative father's parental rights. *In re Barlow, supra.* Section 39 of the Adoption Code, MCL 710.39; MSA 27.3178(555.39), creates two categories of putative fathers and provides different standards for terminating the rights of each:

(1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests

of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father the court shall terminate his rights to the child.

(2) If the putative father has established a custodial relationship with the child or has provided substantial and regular support or care in accordance with the putative father's ability to provide such support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA.

At issue in this case is whether the trial court erred, first, in concluding that appellant's parental rights should be evaluated under subsection 39(1) and, second, in concluding that it was in the best interests of RFF that appellant's parental rights be terminated. I would hold that the trial court erred in finding that under the circumstances of this case appellant did not come within the provisions of subsection 39(2).

Amendment of subsection 39(2) was one of the July 1996 recommendations of Lieutenant Governor Binsfeld's Children's Commission. The commission contended that a putative father who had not established a custodial relationship with the child should have provided "substantial and regular" care or support to the child in order to be accorded subsection 39(2) status in a proceeding to terminate parental rights. The commission objected that the term "support" might be broadly interpreted so as to apply to circumstances where no child support was paid by the putative father until the Family Independence Agency (FIA) sought to establish paternity, or to cir-

cumstances where the child support is paid involuntarily and only because of the entry of a court order. As a result, the commission urged the adoption of language that would require willing, substantial, and regular participation by the putative father. Report of the Binsfeld Children's Commission, pp 83-84 (1996).

Senate Bill 415 was introduced in the Michigan Senate in April 1997, reflecting this recommended change to subsection 39(2). The bill passed the Senate in June 1997, 1997 Journal of the Senate 917 (No. 53, June 11, 1997), and was immediately thereafter referred to the Michigan House Judiciary Committee, 1997 Journal of the House 1211 (No. 55, June 12, 1997). The bill was amended in the House Judiciary Committee on March 10, 1998, with the insertion of the language "IN ACCORDANCE WITH THE PUTATIVE FATHER'S ABILITY TO PROVIDE SUCH CARE OR SUPPORT," qualifying the "substantial and regular" language added to the statute by the Senate. 1998 Journal of the House 410 (No. 23, March 10, 1998). The amended bill passed the House 106 yeas and 0 nays and returned to the Senate, 1998 Journal of the House 605 (No. 32, March 31, 1998), which concurred in the House amendment 31 yeas, 0 nays, 5 excused, 1 not voting, 1998 Journal of the Senate 569 (No. 30, April 15, 1998). Contrary to the conclusion reached by the majority, I would conclude that the House amendment effectively codified the multifactor approach for determining case by case whether the putative father has provided reasonable care and support under the circumstances of the case set forth in *In re Gaipa*, 219 Mich App 80; 555 NW2d 867 (1996).

The majority relies on the Senate Fiscal Agency's analysis found in Senate Legislative Analysis, SB 415,

August 26, 1998, to support its conclusion that subsection 39(2) as amended does not address the circumstances presented by this case. In my view, this particular bill analysis is not persuasive evidence of the Legislature's intent when it amended subsection 39(2).

First, the bill analysis states on its face that it "was prepared by nonpartisan Senate staff for use by the Senate in its deliberations and does not constitute an official statement of legislative intent." Thus, while the analysis may constitute legislative history, it cannot be considered evidence of legislative intent sufficient to satisfy our duty to interpret legislative enactments in accordance with the plain meaning of specific language of the statute. *House Speaker v State Administrative Bd*, 441 Mich 547; 495 NW2d 539 (1993). Second, the August 26, 1998, bill analysis, completed after the bill was enrolled, is nearly identical to a bill analysis completed on June 20, 1997, just after the bill first passed in the Senate, but well before the House amendment of the bill. See Senate Legislative Analysis, SB 415, June 20, 1997. Nothing in the bill analysis relied on by the majority acknowledges or gives any meaning to the statutory language added by the House that requires inquiry into the putative father's ability to provide support or care.

Third, to the extent legislative analysis reports should be considered by this Court in determining legislative intent, all the legislative analysis concerning SB 415 should be considered. The House Legislative Analysis Section prepared an addendum to the June 20, 1997, Senate Fiscal Agency analysis of SB 415, which states in relevant part:

The House Judiciary committee amended the bill to require that the assessment of whether a putative father's support or care was "substantial and regular" be measured in accordance with his ability to provide support or care. [House Legislative Analysis, SB 415, March 11, 1998.]

Nothing in the language of the statute or the available legislative analysis suggests that a judicial determination that a putative father who, because he is unaware of the birth mother's pregnancy is unable to provide support or care, is inconsistent with the legislative intent behind the amendment of subsection 39(2). The House legislative analysis lends credence to the idea that the House amendment was intended to address the due process concerns identified in the Senate Fiscal Agency analysis. The fact that no legislators voted against SB 415 at final passage further supports this notion. Indeed, in construing a statute, courts should presume that every word has some meaning and should avoid any construction that would render a statute, or any part of it, surplusage or nugatory. *Altman v Meridian Twp*, 439 Mich 623, 635; 487 NW2d 155 (1992). The construction I urge gives meaning to the phrase added by the House amendment, is consistent with common sense, and avoids unreasonable consequences. *In re Dawson*, 232 Mich App 690, 696; 591 NW2d 433 (1998).

The trial court found that appellee's concealment of the pregnancy and the type and quality of counseling received from the counseling agency was irrelevant to appellant's ability to provide support.[1] I would reverse and remand for specific factual findings regarding

---

[1] At the June 25, 1999, hearing during which the trial court found that appellant was a subsection 39(1) putative father, the trial court stated:

appellant's ability to provide substantial and regular support or care for appellee or RFF, including findings regarding whether appellant could provide any support and care, much less substantial and regular support and care, where he learned about the imminent birth of RFF only three weeks before delivery; whether the circumstances under which appellant was told about the pending adoption suggested that adoption was a *fait accompli*, adversely affecting the timing of his attempt to provide care or support to RFF; whether placement of RFF in the custody of the adoptive parents immediately after his birth, making any contact with RFF extremely difficult, also affected his ability to provide care or support to RFF; and whether the counseling provided by the adoption agency may have misled appellant about his legal obligations if he was to decide to seek custody of RFF.[2]

---

I find that it's not appropriate for the Court to make the giant leap that had he known he would have provided the support. Or had he gotten better counseling from the adoption agency, he would have put in for confinement expenses or whatever. I don't think the law permits the Court to make that kind of leap. . . . He certainly had the ability to contribute something had he wanted to do that, even if it was only care and concern and a ride to the doctor or something. He wasn't able to do that, and he didn't do it. [T]he court, therefore, finds that we can't make the leap that he's a Section 2 father because there was no support, and for whatever reason, I don't believe he qualifies under Section 2.

The trial court's written opinion concerning the best interests findings, dated July 22, 1999, refers to *In re Dawson, supra* at 690, in which this Court concluded that subsection 39(2) as written before the amendment at issue in this case did not account for a situation in which the mother conceals the pregnancy from the putative father, and then states "[t]his court reached the same conclusion . . . ."

[2] The trial court's opinion states that by finding it was not in the best interests of the child to award custody to appellant, it was aware that "it

Even if appellant does not come within the provisions of subsection 39(2), I would still reverse the trial court's order. While I generally agree with the statement of the facts set forth in the majority opinion, several significant facts not mentioned by the majority lead me to the firm and definite conviction that the trial court made a mistake. The record establishes that appellant and his parents were quite shocked to learn that appellant was soon to be a father and that appellee had made plans to place the baby for adoption. When appellee advised appellant that she was pregnant and would be placing RFF for adoption, she told appellant that her motivation in placing RFF for adoption was her intention to attend college in the fall. Appellant did respond by indicating that he had planned to attend the Marine Corps boot camp that summer, but the record reflects that appellant stated this in a sarcastic manner and not in an apparent acquiescence to appellee's adoption decision. Nevertheless, appellant and his parents worked to gather information that would enable him to make a reasonably informed decision about whether to agree to appellee's plan under the circumstances.

Terry Budek, the pregnancy counselor with Family and Children's Service of Midland (the adoption agency handling the adoption), sent a letter to appellant before RFF's birth in which she described her position as one "to support all members of the birth family." The letter further stated that she was there to provide services including advice about "birthparent rights and choices . . . free of charge." Appellant also

---

appears we are favoring a birth mother who lied, and an adoption agency which poorly handled the pre-adoption matters."

testified that Ms. Budek discouraged him from seeking legal advice and that, in response to an inquiry about the expenses for care of RFF and his willingness to pay what he could, she told him that the costs were being taken care of by the adoptive parents.

When appellant went to the adoption agency to consent to the adoption, Ms. Budek was not in the office. A volunteer working at the reception desk in the office connected appellant and his mother with Ms. Budek by telephone. Ms. Budek told appellant's mother during this telephone contact that RFF had been born, and appellant's mother relayed this information to him. When appellant learned through this telephone contact that RFF had been born, he became upset and began to cry. Appellant acknowledged that he refused to sign the adoption consent at that time, but the complete record establishes that his refusal was at the behest of the agency receptionist who suggested that appellant go home and think about his decision further.

In deciding it was not in the best interests of RFF to grant custody to appellant, the trial court relied heavily on its determination that appellant was not sufficiently mature to raise RFF and would be heavily relying on his parents for up to several years. Significantly, however, the trial court consistently sustained on the basis of relevancy objections to testimony from appellant's dentist, aunt, and pastor about their observations and knowledge of appellant's maturity and ability to handle responsibility, even though they had known appellant for long periods. I believe this was error that prevented appellant from making a complete record about his ability to parent RFF under the difficult circumstances presented here.

In this regard, I disagree with the majority's conclusion that appellant's reliance on *Ireland v Smith,* 451 Mich 457; 547 NW2d 686 (1996), is misplaced. The Supreme Court's decision noted that from the time Ms. Ireland and Mr. Smith's child (Maranda) was born in 1991 (both parents were in their mid-teens at the time), to Ms. Ireland's enrollment in the University of Michigan in the fall of 1993, Ms. Ireland's mother and grandmother "provided nearly all the necessary support." *Ireland, supra* at 459.[3] The Court acknowledged that following her enrollment in college, Ms. Ireland would likely continue to reside with her mother as well as on campus at the University of Michigan. *Id.* The Court also acknowledged the likelihood that she would change residences at the university and that she would move again after completing her studies. The Court pointedly stated that "[s]uch changes, normal for a young adult at this stage of life, d[id] not disqualify Ms. Ireland for custody." *Ireland, supra* at 465.

I agree wholeheartedly with this sentiment and believe it applies in this case. " 'The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . .' " *In re Boursaw,* 239 Mich App 161, 176; 607 NW2d 408 (1999), quoting *Santosky v Kramer,* 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). This Court reviews hundreds of cases annually in which parental rights have been terminated only after multi-

---

[3] The Court of Appeals decision in *Ireland v Smith,* 214 Mich App 235, 240; 542 NW2d 344 (1995), similarly noted that after Maranda's birth, "[b]oth parties continued in high school with apparently normal pursuits, including sports, cheerleading, dating, and partying . . . ."

ple services (i.e., parenting classes, drug treatment, job training) have been provided over multiple months to the parents by the FIA. In this case, similar services were offered appellant by RFF's grandparents, blood relatives. Given the circumstances of this case, including the concealment of the pregnancy and the "counseling" provided by the adoption agency, appellant's fundamental liberty interest to parent should not evaporate because he will not be the model parent in the first years of RFF's life.

For the reasons stated above, I would reverse.