# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* KJP-D, KFP-D, Minors.

UNPUBLISHED
August 11, 2015

No. 323596
Kent Circuit Court
Family Division
LC Nos. 14-025762-AM;
        14-025763-AM

Before: SERVITTO, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Petitioners Robert Baker and Anitra Baker appeal by right the trial court's order, entered after a hearing held pursuant to MCL 710.45 of the Michigan Adoption Code ("Section 45 hearing"), dismissing their petition to adopt the minor children. At the Section 45 hearing, petitioners challenged the decision of respondent, the superintendent of the Michigan Children's Institute (MCI), denying consent to adopt the children. The trial court found that respondent's decision was not arbitrary and capricious. For the reasons stated below, but with compassion and appreciation for the depth of petitioners love for and commitment to the children, we affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

The minor children are twins who were born in early 2011. The twins were born eight weeks prematurely. They had been exposed to illegal drugs in utero, and they each exhibited significant delays in cognitive development.

While infants, the twins (as well as their older sister) were removed from their parents' home and placed in foster care because of their mother's emotional instability and substance abuse. The twins were subsequently placed with their paternal grandmother. The parental rights of the twin's parents were terminated. Shortly thereafter, the twins were removed from placement with the grandmother. Police and Children's Protective Services (CPS) had responded to a domestic disturbance involving the twins' birth-mother and -father, at which time it was discovered that the grandmother had released the twins to their birth-parents despite the termination of their parental rights.

Thereafter, the twins were placed in their current foster care placement. The twins' foster parents are two Caucasian males in a same-sex relationship. Sometime later, petitioners, who are the twins' paternal great-aunt and great-uncle, expressed interest in being considered as an

-1-

adoptive placement for the twins because they believed that the twins should be raised by family members. Petitioners completed an adoption orientation with Lutheran Adoption Services.

Petitioners began having visitations with the twins. Adoption social worker Michelle Kraut of Lutheran Adoption Services completed an adoptive family assessment regarding petitioners. In pertinent part, the assessment indicated that petitioners did not plan to use daycare because Anitra worked at nighttime and was available during the day, and Robert was retired. The assessment further mentioned that Anitra's two sons from a previous relationship were incarcerated, each having pleaded no contest to conspiracy to commit unarmed robbery, unarmed robbery, and felony-firearm. Petitioners became "emotional" when discussing Anitra's sons' incarceration; they believed that "the boys were unjustly charged and had poor legal representation." Further, the assessment indicated that petitioners both had a positive attitude about the twins being placed with them, "although [Robert was] more apprehensive about making a permanent commitment to the children." The assessment indicated that both petitioners were in good physical health, with the exception that Robert was being treated for high cholesterol and sleep apnea. As a result of the assessment, Kraut recommended that the twins be placed with and adopted by petitioners.

Subsequently, respondent granted consent to adopt to the twins' foster parents, and denied consent to adopt to petitioners. Respondent's decision denying consent to petitioners specifically referenced two supporting factors: (1) "[t]he length of time the child(ren) has lived in a stable, satisfactory environment and the desirability of maintaining continuity," and (2) the "[w]illingness and ability of a relative to assure the physical and emotional well-being of the child[ren] on a permanent basis."

With respect to the first factor, respondent indicated that when the twins (at approximately age 2-1/2) were placed in foster care, their "speech was unintelligible." The twins only used a few words; most of their communication was through "grunting and pointing." Consequently, the twins were evaluated and found to be eligible for special education services due to their "significant delays in language, play, and social skills." Additionally, when the twins entered foster care, their behavior was "extreme"; they would continually hit one another and ignore directions. Respondent also noted that the twins had "exaggerated fears," including the fear of taking a bath. However, during the approximately six months that the twins had been in foster care they made "impressive gains" in their development. The twins' speech was "more understandable," and their language skills were "more appropriate to their age." Regarding their health, their height and weight had substantially increased as well. Respondent indicated that the twins continued to exhibit emotional and behavioral issues due to their past trauma; however, after spending time in foster care, they "appear[ed] to be much calmer and responsive to direction." Respondent found that, overall, the twins had benefitted from the "structure and routine" provided in the foster home, and they had formed attachments to their foster parents. It was noted that the twins' lawyer guardian ad litem (LGAL) supported adoption by the foster parents. Accordingly, respondent found that it would not be in the best interests of the twins to be removed from their placement in foster care.

With respect to the second factor—the "[w]illingness and ability" of petitioners "to assure the physical and emotional well-being of the child[ren] on a permanent basis"— respondent focused largely on petitioners' ages and their schedule. It was noted that Anitra was

50 years old and Robert was 69 years old. Respondent found that the twins needed a "very structured" environment because it was likely that they would continue to present challenges to their parents. Respondent indicated that Anitra would be 60 years old and Robert would be almost 80 years old by the time the twins reached their teenage years. Moreover, because Anitra worked third shift and slept in the morning and early afternoons, Robert would be the primary caregiver. Respondent found that the twins need a "considerable amount of attention due to their special needs." The twins required parents who could take them to therapy twice a week and who had "sustained energy to keep up with" them. Respondent also noted that Robert initially had reservations about adopting the twins. Although petitioners had adult children, it would be a "major adjustment" to introduce two young children into their lives.

Respondent further found it "concerning" that Anitra's two adult children (Robert's step-children) were incarcerated. Respondent indicated that parents cannot be held responsible for their children's actions, but he found it concerning that Anitra felt strongly that her sons were "unjustly charged and had poor legal representation." Respondent stated that the police report from the incident indicated that Anitra's sons had attempted to rob a former girlfriend and also struck the girlfriend's friend in the head numerous times with a pistol. The pistol was later recovered in a bedroom in Anitra's house. Respondent found it concerning that petitioners "minimize[d]" Anitra's sons' criminal activity. Accordingly, respondent found "serious concerns" regarding petitioners' ability to assure the physical and emotional well-being of the twins on a permanent basis. After making these findings, respondent concluded that it was not in the best interests of the twins to be adopted by petitioners. Therefore, respondent denied petitioners consent to adopt.

Petitioners appealed respondent's decision under MCL 710.45 in a Section 45 motion. Petitioners alleged that respondent's denial of consent was arbitrary and capricious. Petitioners asked the trial court to set aside the denial of consent and grant petitioners consent to adopt.

The trial court held a hearing on petitioners' Section 45 motion. Respondent, Anitra, and Robert testified at the hearing. Respondent testified that his decision was supported by the fact that the twins had special needs and developmental delays. He testified that when the twins were removed from their previous relative placement at approximately 2-1/2 years of age, they could barely speak. However, based on information provided to him by the adoption worker and other professionals who had interacted with the twins, Respondent found that the twins had made significant progress with the foster parents in regard to their developmental delays. Specifically, respondent testified,

> [W]hen the children were removed, at the time of their removal they were infants, but they had already been exposed to a very unstable home in which substance abuse was a problem, so that these children—my belief was prenatally, as well as in early infancy, were deprived of stable, loving parental care. Then they were placed in a relative home where they again were deprived of stable loving care . . . [N]ow they have been placed in a foster home where they are receiving stable and loving care, and that, in my opinion, to remove them from a home where they are now making progress would not be in their best interest.

-3-

Thus, respondent believed that that the "significant" period of time that the twins had spent with their foster parents (10 months at the time of the hearing) and the "significant" relationship they had developed with the foster parents needed to be considered.

Moreover, with respect to petitioners, respondent testified that he was concerned that they may not have the "sustained energy" needed to care for the twins based on their ages. For instance, by the time the twins reached 18 years of age, Anitra—the younger of the two petitioners—would be in her mid-60s. Robert would be in his 80s. Further, Respondent testified that the twins had never been taken care of by petitioners, and that it was speculative whether petitioners could take care of children with special needs.

Additionally, respondent testified that, in making his decision, he considered the fact that Anitra had "minimized" her sons' criminal activity. Respondent found it significant that both of Anitra's two adult children had criminal histories; this fact provided an indication of "some kind of a failure on the part or lack of ability on the part of [petitioners] to provide the kind of structured environment in which one would grow up successfully to adulthood."

Finally, Respondent testified that he was aware that the adoption agency and the foster care agency disagreed about who should adopt the twins. Although the adoption agency supported adoption by petitioners, the foster care agency supported adoption by the foster parents. When asked by the trial court why he did not follow the adoption agency's recommendation, respondent explained that he was "especially concerned" with the fact that the twins had been "severely neglected" at a very young age and were further "delayed" while in their relative placement. Respondent reiterated that he had received information that the twins had made significant progress in foster care; thus, he disagreed with the recommendation that the twins be removed "from a placement where they were doing very well."

Anitra testified regarding her belief that the twins should be placed with her and Robert. With respect to her sons' criminal history, Anitra testified that they were incarcerated as adults and had no issues with the juvenile system when they were younger. She had received information from the victims suggesting that the facts of the crime may not have been as they were portrayed by the prosecution, and she relayed that information to the adoption agency. Anitra testified that she did not defend what her sons did.

With respect to the twins, Anitra testified that she and Robert had a bond with the twins; they first started interacting with the twins when Anitra's sister (the twins' grandmother) cared for them during the initial relative placement. Anitra worked five nights a week, doing housekeeping at a hospital. She worked third shift, which started at 10:00 p.m. and ended at 6:30 a.m.; however, Anitra believed that her schedule would not prevent her from caring for the twins. Anitra testified that she did not have any health issues except arthritis, and that it had no effect on her mobility. She did not have any problem interacting with the twins and playing with them. Anitra testified that she and Robert could provide a structured environment for the twins and were aware of their special needs. She had experience working with children, particularly children with developmental issues and special needs. Finally, Anitra believed that the twins would benefit from placement with their extended family.

Robert similarly testified regarding his and Anitra's desire to adopt the twins. He testified that he was raised by extended family for several years, and that he wished to do the same for the twins. Robert was retired from an automotive company where he had worked for 42 years. He testified that, after retirement, he had begun working two days a week as a security guard, which required him to be on his feet and to exert energy. During the year after he retired, Robert worked as a security guard in an elementary school, so he had experience interacting with young children. Robert testified that he had no health issues that would affect his energy level, and nothing prevented him from giving the twins a considerable amount of attention because of their special needs. With respect to Anitra's sons' criminal history, Robert testified that he did not believe that he or Anitra had any responsibility for their incarceration.

Following testimony and the parties' arguments, the trial court issued a written opinion denying petitioners' Section 45 motion and their request for consent to adopt. The trial court stated that it was "not persuaded" that respondent had relied on erroneous information or needed additional evidence to support his conclusion that the twins were very developmentally delayed and were making significant progress with their foster parents. The trial court emphasized that the possibility that the twins would continue making progress with petitioners did not justify the risk of removing them from the foster parents.

Further, the trial court stated that it was "not persuaded" that respondent's concerns regarding petitioners' ages were based on erroneous information or needed additional evidence. The trial court noted that petitioners failed to present evidence refuting respondent's concern regarding their ages; petitioners merely offered themselves as witnesses for the trial court to "observe their present condition and demeanor." Thus, the trial court stated that it could not conclude that respondent's concerns that petitioners' ages may affect their ability to care for the twins lacked reason.

Lastly, the trial court stated that it did not believe that respondent's concerns regarding Anitra's minimization of her sons' criminal history were based on erroneous information or required additional evidence. While the trial court rejected the notion that "parents of criminals must have some moral flaws," the trial court found that the evidence called into question Anitra's "commitment to teaching the twins about accountability and abiding by society's rules."

For the foregoing reasons, the trial court stated that it could not find by clear and convincing evidence that respondent's decision was arbitrary and capricious. Rather, respondent's decision was based on the "rational" and "persuasive" reason that the twins were in a stable and satisfactory placement in the foster home, they had been making significant progress in that placement, and they were emotionally bonded with the foster parents. Accordingly, the trial court found that there were "sensible and appropriate criteria" on which respondent had based his decision. The trial court further stated that, while it found "less compelling" respondent's other concerns regarding petitioners' ages and Anitra's minimization of her sons' criminal activity, these reasons also were not arbitrary and capricious. The trial court emphasized that these were "secondary bases" for respondent's decision, and that respondent needed only "a single good reason" to withhold consent. As a result, the trial court denied petitioners' motion and dismissed their petition for adoption. This appeal followed.

## II. STANDARD OF REVIEW

A trial court's review of the MCI superintendent's decision to withhold consent is governed by MCL 710.45. *In re Cotton*, 208 Mich App 180, 183; 526 NW2d 601 (1994). The petitioner bears the burden of proving by clear and convincing evidence that the decision to withhold consent was arbitrary and capricious. *Id*. at 184. "The clear and convincing evidence standard is the most demanding standard applied in civil cases." *In re ASF*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 324821), slip op at 5. "Whether the family court properly applied this legal standard is a question of law reviewed for clear legal error." *In re Keast*, 278 Mich App 415, 423; 750 NW2d 643 (2008).

The trial court is not permitted to review the MCI superintendent's decision de novo. *ASF*, slip op at 5; *Cotton*, 208 Mich App at 184. "[T]he focus is not whether the representative made the 'correct' decision or whether the probate judge would have decided the issue differently than the representative, but whether the representative acted arbitrarily and capriciously in making the decision." *Id*. Moreover, the trial court is required to focus on the reasons given by the MCI superintendent for withholding consent to adopt, not whether any good reason existed to authorize adoption in petitioners' favor. *Id*. at 185 ("[I]t is the absence of any good reason to withhold consent, not the presence of good reasons to grant it, that indicates that the representative was acting in an arbitrary and capricious manner.").

## III. ANALYSIS

Petitioners failed to establish in the trial court that respondent's decision was arbitrary and capricious. See *id*. at 183. One of the reasons stated by respondent in denying petitioners consent to adopt was that the twins were severely delayed developmentally upon placement in foster care and had made significant progress during that placement. Respondent's testimony established that, in making his decision, he relied on information provided to him by the adoption agency and by other professionals who had interacted with the twins.[1] Petitioners notably did not dispute that the children were making significant progress with the foster parents. Rather, petitioners focused on *their* ability to care for the special needs of the children. In doing so, petitioners essentially argued that there were good reasons that they should have been granted consent to adopt, rather than focusing on whether there was a good reason to withhold consent. See *id*. at 186. Respondent's reasoning in withholding consent was factually supported and was "not frivolous or fanciful." See *id*. Therefore, because respondent's decision to withhold consent was supported by a "good reason," the trial court did not commit clear legal error in denying petitioners' Section 45 motion and dismissing their adoption petition. *Keast*, 278 Mich App at 423, 425.

Respondent also provided additional reasons in support of his decision to deny petitioners consent to adopt. These reasons included petitioners' ages impacting their future ability to care

---

[1] The MCI superintendent is permitted to rely on the results of an agency investigation or recommendations of staff members in making a decision to withhold consent. *Cotton*, 208 Mich App at 186.

for the children and the fact that Anitra had "minimized" her adult sons' criminal activity. The trial court stated that it found these reasons "less compelling" than the reason that the twins would be best served by maintaining continuity in the foster care placement where they had made significant progress in overcoming developmental delays. The trial court was only required to find that Johnson had one good reason to withhold consent in order to deny petitioners' Section 45 motion. See *id*. at 425 ("It is the absence of *any* good reason to withhold consent . . . that indicates that the decision maker has acted arbitrarily and capriciously.") (emphasis added). Therefore, because we find that the first reason advanced by respondent was not arbitrary and capricious, we need not consider the additional reasons supporting his decision. Nevertheless, we have reviewed all of the reasons supporting respondent's denial of consent to adopt, and we find no clear legal error in the trial court's ruling that respondent's decision to withhold consent was not arbitrary and capricious. See *ASF*, slip op at 9 ("[I]t was not improper, or discriminatory, for the superintendent to consider petitioners' ages relative to their ability to provide for ASF's long-term care.").

Petitioners advance a number of additional arguments on appeal. First, petitioners argue that there is a strong preference in MCL 722.954a that children should be placed with relatives. While MCL 722.954a does provide a relative preference in "the initial stages of the process," it only applies "immediately after a child is removed from his or her parents' care and during the statutory review period" thereafter. *In re COH, ERH, JRG, & KBH*, 495 Mich 184, 198; 848 NW2d 107 (2014). Thus, this preference is not applicable to decisions made in the period after parental rights have been terminated, and thus is not applicable to respondent's decision to withhold consent to adopt. See *id*.

Next, petitioners argue that the trial court should have considered the best-interest factors in the Child Custody Act, MCL 722.23, and the Adoption Code, MCL 710.22(g). The best-interest factors in the Child Custody Act are not applicable because this is an adoption case, not a child custody dispute. Adoption cases are governed by the Adoption Code. See MCL 710.21, *et seq*. The Adoption Code does aim to promote the best interests of adopted children. See MCL 710.21a(b); *In re RFF*, 242 Mich App 188, 207-208; 617 NW2d 745 (2000). However, because the trial court did not find respondent's denial of petitioners' petition for adoption to be arbitrary and capricious, it was not required to go beyond the evidence presented at the Section 45 hearing to determine the children's best interests, see *Keast*, 278 Mich App at 423, 425, and was not permitted to decide the adoption issue de novo. *Cotton*, 208 Mich at 184-185.

Petitioners also argue that the trial court failed to consider the "ethnic and cultural interest" of the children because the children were African-American and born into a heterosexual household, but had been placed with foster parents who were Caucasian and in a same-sex relationship. In making this argument, petitioners fail to advance any reason why the trial court's lack of explicit reference of this factor makes respondent's decision arbitrary and capricious, especially when petitioners did not make this argument before the trial court and did not present evidence on this issue upon which the trial court could make a factual or legal finding. *Cotton*, 208 Mich App at 184; see also *Keast*, 278 Mich App at 434-435. We find no reversible error in the trial court's failure to sua sponte consider this issue.

This Court empathizes with the depth of feeling displayed by petitioners at oral argument and throughout these proceedings. It is obvious that petitioners feel a bond of love and kinship with the children in this case. Nothing in this opinion should be taken by petitioners as casting doubt on their sincere desire to care for the twins or the strength of their love and affection for them. In a time when so many children go unwanted in this state, the twins are blessed with not one but two caring couples who seek to provide them with love and shelter. Although lacking the force of law, it is this Court's hope that petitioners are able to remain a part of the twins' lives in some capacity as they move forward in life. Nonetheless, we are constrained by the record and the applicable standard that governs our review of this matter, and we must answer the legal question raised in this case in accordance with the laws of this state. We accordingly affirm the trial court's finding that respondent's reasons for denial of petitioner's petition for consent to adopt was not arbitrary and capricious. *Cotton*, 208 Mich App at 184.

Affirmed.


/s/ Deborah A. Servitto
/s/ Jane M. Beckering
/s/ Mark T. Boonstra