*In re* ZIMMERMAN

Docket No. 279696. Submitted December 5, 2007, at Grand Rapids. Decided January 3, 2008, at 9:10 a.m. Vacated in part and remanded to the circuit court, 480 Mich 1143.

Steven Zimmerman was born out of wedlock to Kassandra Zimmerman as a result of a sexual relationship with Shaun A. Byron. He was immediately placed by Kassandra in the home of prospective adoptive parents Shane E. and Patricia Johnson. The Johnsons filed a petition in the Ottawa Circuit Court, Family Division, seeking to adopt Steven. Kassandra submitted a petition to terminate Byron's parental rights, indicating that she planned to voluntarily release her parental rights if the court granted her petition to terminate Byron's parental rights. The court, Jon H. Hulsing, J., conducted a hearing to determine Byron's parental rights and who should have temporary custody of Steven. The court held that it was in the best interest of Steven to grant Byron temporary custody rather than terminate Byron's parental rights. The Johnsons and Kassandra Zimmerman appealed.

The Court of Appeals *held*:

1. The trial court did not clearly err in finding in favor of Byron with respect to the best-interest factors concerning the capacity to provide love, affection, and guidance and to provide for the child's material needs and the factors regarding Byron's mental and physical health and the benefits that Steven would receive by having a relationship with his two half-siblings (Byron's other children). MCL 710.22(g)(*ii*), (*iii*), (*vii*), and (*xi*).

2. The trial court erred in finding in favor of Byron with respect to the best-interest factor regarding permanence of the family unit. MCL 710.22(g)(*v*).

3. The trial court did not clearly err in finding that the moral fitness factor, MCL 710.22(g)(*vi*), although found against Byron, did not outweigh the factors favoring Byron. The order denying the petition to terminate Byron's parental rights must be affirmed.

4. The trial court did not err in granting immediate custody to Byron once it completed the best-interest determination in his favor. MCL 710.39(1), which provides that "the court shall inquire into [the father's] fitness and his ability to properly care for the

child and shall determine whether the best interests of the child will be served by granting custody to him," while not explicitly directing the court to grant custody to a father, implies that granting custody in this situation is appropriate. The order granting immediate temporary custody to Byron must be affirmed.

5. The trial court did not err in failing to immediately conduct a full "best interest" determination regarding both parents to properly balance their competing claims for custody, because the matter was filed under the Adoption Code and the hearing was specifically limited to determining whether Byron's rights as a father should be terminated. MCL 710.36(1).

Affirmed.

*Speaker Law Firm, PLLC* (by *Liisa R. Speaker* and *Jodi M. Latuszek*), for Shane E. and Patricia Johnson and Kassandra Zimmerman.

*Burda Law Offices, PLC* (by *Christi L. Burda*), for Shaun A. Byron.

Before: BANDSTRA, P.J., and METER and BECKERING, JJ.

PER CURIAM. As a result of a sexual relationship between Kassandra Zimmerman and Shaun Alan Byron, Steven Zimmerman[1] was born out of wedlock. He was immediately placed in the home of prospective adoptive parents Shane Edward Johnson and Patricia Johnson. At a hearing to determine the parental rights of Byron, the lower court determined that it was in the best interest of Steven to grant Byron custody. On appeal, Kassandra and the Johnsons contend that the trial court erred in making that determination. Further, they contend that the lower court's granting of immediate custody to Byron was contrary to the Adoption Code, MCL 710.21 *et seq*. We conclude that the lower

---

[1] This was the name given to the baby at birth by his mother and we refer to the baby using that name rather than a different name given to him by the prospective adoptive parents.

court appropriately considered and applied the "best interest" factors in determining to grant custody to Byron rather than terminate his parental rights. Further, we conclude that the trial court did not err in entering an order requiring that custody of Steven immediately be transferred from the Johnsons to Byron, pending a further custody determination regarding the rights of both of the child's biological parents.

BACKGROUND FACTS AND PROCEEDINGS BELOW

Zimmerman and Byron were involved in a dating and sexual relationship from February or March 2006 until July 2006. In October 2006, Zimmerman realized that she was pregnant, but she did not inform Byron. He learned about her pregnancy from a mutual acquaintance who noticed that Zimmerman appeared to be pregnant. Byron approached her about the matter two weeks before she gave birth and expressed disagreement with her plan to place the child for adoption.

Zimmerman immediately placed Steven with the Johnsons when he was released from the hospital after his birth on March 1, 2007. See, generally, MCL 710.23a, 710.23d, and 710.23f. The Johnsons filed a petition for adoption on April 9, 2007. Zimmerman submitted a petition to terminate Byron's parental rights. She indicated that she planned to voluntarily release her parental rights to the child if the court granted her petition to terminate Byron's parental rights. See MCL 710.31(3).

The trial court held a temporary placement hearing pursuant to MCR 3.805. Three witnesses testified: Zimmerman, Byron, and Dorothy Pellegrom, Byron's grandmother.

ZIMMERMAN'S TESTIMONY

Byron disagreed with Zimmerman's plan to place Steven for adoption because he did not believe that adoptive parents could love Steven as much as his biological parents could. Byron suggested forming a joint-custody arrangement. Zimmerman believed adoption was in Steven's best interest because she was not ready to parent a child. She also believed that it was better to place Steven in a stable home instead of transferring him back and forth between them. Byron did not provide her with any money or supplies for the child's support or offer to do so. Byron did try to help her find an online Medicaid website through which she might have received assistance, but he was not able to do so.

Byron, who is 22 years of age, resides with his parents, Shane and Jamie Byron. He has joint legal and physical custody of two other children, Michael, age four, and Mackenzie, age two, from a prior relationship with Stephanie Fox. The children alternate custody between him and Fox every other day. Shane, Byron's father, is a recovering heroin addict who consumed alcohol and took other drugs to get intoxicated. Zimmerman and Byron smoked marijuana in the house, and Jamie, Byron's mother, sometimes smoked it with them. Byron's sister Sarah also smoked marijuana, and sometimes sold marijuana to Byron when he did not have any. Zimmerman saw Byron take a Vicodin tablet while he was drinking beer. Byron told her that "he takes whatever he can get his hands on," and that he used the days when he had custody of his children as his "recovery days." He sometimes smoked marijuana in the house when his children were present. Byron was on probation for domestic violence against Fox and he had also been arrested for giving alcohol to minors at a party he hosted.

Michael and Mackenzie slept in Byron's room when they stayed with him overnight, and Byron would sleep in the living room. Sarah's boyfriend also lived in the house. Byron treated his children well, but kept them inside watching television all day instead of taking them outside to play. He sometimes left them alone with Shane, who was often intoxicated.

Zimmerman intended to seek custody of Steven if Byron's parental rights were not terminated. When she began to describe her own capacity to care for the child, the trial court declined to hear the testimony, explaining that the sole purpose of the hearing was to determine Byron's fitness. The court stated that if it awarded temporary custody to Byron, Zimmerman could bring an action for custody.

### BYRON'S TESTIMONY

Byron denied proposing a joint-custody arrangement; he wanted sole custody because Zimmerman was not interested in raising the child. He was concerned that she had not sought prenatal care and he gave her a telephone number to apply for Medicaid, but she did not take it.

Byron denied using alcohol or marijuana in the presence of his children, although he admitted doing so when they were asleep. He quit smoking marijuana in January 2007, although he admitted using it as recently as two months before the hearing. He admitted that he also was convicted of possession of drug paraphernalia, specifically a marijuana pipe. Byron had tendered a guilty plea to a charge of furnishing alcohol to minors, but he explained that the minors in question were uninvited guests who brought their own alcohol to a party he gave for coworkers.

Regarding the domestic-violence incident, Byron explained that he confronted Fox after hearing that she had slept with another man. Fox responded by moving her leg as if she were about to kick him. He held down her leg so she could not kick him, and demanded to know if the rumor was true. She told him it was, and he left the room. She reported the incident to the police. He entered a guilty plea and was sentenced to probation. The sentencing court agreed to expunge his conviction upon successful completion of probation.

Byron denied that his father was an alcoholic or heroin addict. He explained that his father took methadone for pain related to his hernia. He denied telling Zimmerman that his father was a heroin addict, but admitted telling her that his father looked like a heroin user when he took methadone. He denied that his mother used marijuana with him. He admitted that his mother knew that he and Sarah smoked marijuana in the house, but he stated that she "wasn't happy about it." He stated that Sarah no longer lived at home. He did not believe that she used marijuana anymore, because "she only smoked because I did and she always looked up to me." He stated that both of his parents were employed.

Byron testified that he has held a full-time job assembling antennas for RA Miller for three years. He earned just over $20,000 the previous year. He was in his first semester of an 18-month program to become an electrician. He intended to find his own home after finishing the program and finding full-time work as an electrician. He admitted that he had only $428 in a checking account, and $400 or $500 in a retirement account. He explained that he depleted most of his retirement account to pay for the first semester of

school. He believed that his parents and other family members would help him if he urgently needed money for the children.

Byron outlined his planned living arrangements if he received custody. Steven would move into the house where Byron lived with his parents and his other two children. Byron would share a room with Steven and his other children would share a bedroom. The master bedroom in his parents' house would accommodate a crib and swing and the house was safe for a baby. Byron described his parents as "very supportive" of his efforts to care for his children. Further, Byron was engaged to marry a coworker who was supportive of his decision to seek custody and prepared to coparent the child. They did not have a wedding date set.

Mackenzie attended day care with Byron's aunt, who was a licensed child-care provider. Michael was in preschool in the Grand Haven School District. Byron had discussed the cost of day care for Steven with his aunt, and he already budgeted the cost from his earnings. Byron denied keeping his children inside the house all day. He acknowledged that there were some days that he, Zimmerman, and the children stayed indoors, but explained that this was during cold weather when he preferred to stay inside and talk to Zimmerman. When the weather was nice, he took his children outside to play.

PELLEGROM'S TESTIMONY

Byron's maternal grandmother, Dorothy Pellegrom, testified that she was a licensed foster parent with experience caring for 60 foster children. She stated that Byron interacted well with his children. He was firm with them and followed through when he gave them instructions. She never saw him behave inappropriately

with the children. The entire extended family offered Byron emotional support in raising his children, and would offer him financial support if he needed it. Shane took methadone as treatment for a heroin addiction. Jamie had separated from Shane because of his heroin use, and did not reunite with him until he stopped using it.

DECISION BELOW

Based on this testimony, the court evaluated the best-interest factors, MCL 710.22(g).[2] The court's findings regarding some of the factors can be summarized as follows:

- *(i) Love, affection, and emotional ties.* The court found that the child did not know Byron, therefore, this factor did not weigh in Byron's favor.

- *(ii) Capacity and disposition to give the child love and guidance, and to foster the child's religion, racial identity, and culture.* The court found that Byron demonstrated an adequate ability to provide love and affection for his children. The court noted that there was no significant evidence regarding race, culture, and religion.

- *(iii) Capacity to provide for child's material needs.* The court found that Byron had stable employment and adequate housing. The court acknowledged that Byron was a low-wage earner, but commented that "being poor is not a reason to separate a parent from their child." This factor weighed in Byron's favor.

- *(v) Permanence of family unit.* The court weighed this factor in Byron's favor, commenting that he and his parents formed a close nuclear-family unit.

- *(vii) Mental and physical health.* The court com-

---

[2] The trial court did not evaluate two of the best-interest factors, MCL 710.22(g)(*iv*) and (*x*). Appellants do not contend that the trial court should have evaluated those factors or make any other argument regarding that omission.

mented that there was no indication that Byron had any health problems, and weighed this factor in his favor.

- .(*viii*) *Child's home, school, and community record.* The court commented that the child was too young to have any record.

- (*ix*) *Child's reasonable preference.* The court commented that this factor did not apply.

- (*xi*) *Other applicable factors.* The court weighed this factor in Byron's favor because the child would have a relationship with his half-siblings.

The court gave special consideration to the moral-fitness factor. MCL 710.22(g)(*vi*). It found that Byron's history of marijuana and Vicodin use was unacceptable, but it also determined that Byron had stopped or reduced his marijuana use. It also commented unfavorably on his conviction for furnishing alcohol to minors. The court noted that Zimmerman and Pellegrom both contradicted Byron's denial of his father's heroin addiction, and wondered how Zimmerman could have known about it unless Byron told her. However, it did not specifically find that Byron was dishonest on this matter. The court discounted the domestic-violence incident because it did not believe that Byron's conduct constituted an assault. The court noted that his grandmother testified favorably regarding his parenting skills. The court then stated its ruling:

> He has plans to go to school. He's enrolled in an electronics or an electrical type of career. He's arranged financing for that. . . . He has a goal, a plan. In one and one half years he'll be graduated from that particular program.
>
> He's now engaged. Engaged to be married.
>
> Can people change? Yeah they can. Can people grow up? Yes they do. When people make . . . immature decisions how long do you hold that against them? Well as long as necessary. This factor does weigh against Mr. Byron. But

the fact that he remedied these situations indicates that this factor does not outweigh the other factors.

\* \* \*

So if I find that it is not in the child's best interest to grant custody of the child to him and I terminate—I can't find that. In fact I find the other way. By a strong preponderance of the evidence I do find that it is in the child's best interest that the relationship not be severed.

So I am going to deny the motion to terminate Mr. Byron's parental rights.

The court inquired whether Zimmerman still intended to release her parental rights. She indicated that she did not. The court next considered the issue of placement, stating:

The statute is deliberately vague. We did not get into any of Miss Zimmerman's attributes or why or really allow her an opportunity to explain why she should have custody of the child. And again the statute is very unclear. But what is clear is that Mr. Byron is immediately capable of having the child in his care. So on a temporary basis that's what I'm going to order. Placement on a temporary basis shall be with Mr. Byron.

While the order is not put down to paper[,] the agency, the adoption agency, and the potential adoptive parents who are now the foster care givers are immediately ordered to turn over the child to Mr. Byron for immediate custody. . . .

So what's going to have to happen here is Mr. Byron is going to get immediate temporary placement of the child and then the parties are encouraged to file the appropriate action in the domestic relations court so that a full custody investigation can be conducted.

The court further commented that "this is not a close case. Dad's fit."

Appellants challenge both of the trial court's orders. They first contend that the court misapplied the "best interest" factors of the statute under the facts of this case and thus erred in determining that Byron should have custody of Steven. Further, they contend that, even if that determination were proper, the trial court erred in granting immediate custody to Byron rather than Zimmerman because that approach was contrary to the statutes at issue here.

## THE BEST-INTEREST ANALYSIS

The Adoption Code provides that, in situations like this, "the court shall inquire into [the putative father's] fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him." MCL 710.39(1). The statute provides a list of factors to be considered by the trial court in determining the best interest of the child. MCL 710.22(g).

The trial court's findings of fact regarding the best-interest factors are reviewed by this Court for clear error. *In re BKD*, 246 Mich App 212, 215; 631 NW2d 353 (2001). A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id.*

As noted earlier, the trial court weighed best-interest factors *ii, iii, v, vii*, and *xi* in Byron's favor. Appellants contend that the trial court erred with regard to each of those factors.

With respect to factor *ii*, capacity to provide love, affection, and guidance, the trial court found that Byron demonstrated his capacity to provide love and affection by caring for his two other children. Pellegrom

testified that Byron interacted well with his children and provided firm guidance and instruction. There was no evidence of any difficulties in his relationship with his two other children.

Appellants raise numerous challenges to this finding based on contrary evidence in the record. They cite Zimmerman's testimony that Byron's children spent most of their time watching television, including the risqué program *Family Guy*. They refute the credibility and soundness of Byron's explanation that he only kept the children inside when it was cold and he wanted to talk to Zimmerman to get to know her better. They also question Pellegrom's familiarity with the situation in Byron's home. However, it was the trial court's prerogative to weigh the evidence and evaluate the witnesses' credibility on this matter. *In re BKD, supra* at 220. We are not left with a firm conviction that a mistake was made in weighing this factor in favor of Byron. *Id.* at 215.

Appellants argue that the trial court erred in finding that factor *iii*, capacity to provide for the child's material needs, weighed in Byron's favor. They emphasize that Byron's wages are just barely enough to cover day care and other expenses, and that he does not earn enough to pay for his own housing. They question how he intends to pay for the second and third semesters of his electrician-training program, and how soon this training will result in better-paid employment. They emphasize that he has no significant savings or assets to cover emergency expenses. They also emphasize that there was no evidence regarding the children's medical expenses and needs or Byron's ability to meet them, other than Zimmerman's testimony that she believed Byron received medical insurance through his job.

In *In re RFF*, 242 Mich App 188, 202; 617 NW2d 745 (2000), this Court found that the trial court did not clearly err in weighing this factor against the putative father where the evidence showed that he was still in high school, employed in a low-paying job, and reliant on his parents to provide for his child's material needs. In the instant case, in contrast, Byron has a three-year history of consistent full-time employment. He testified that he has plans to train as an electrician and acquire better employment in the future. He stated that his parents will continue to house him and his children, and that his parents and grandparents will help him pay for needs that he cannot afford. There is no evidence that Byron ever failed to provide for his other children's basic needs. The trial court was evidently satisfied that Byron's income, supplemented by family assistance, was adequate to supply the essentials. We do not conclude that the trial court clearly erred in weighing this factor in Byron's favor.

Appellants argue that the trial court erred in weighing factor *v*, permanence of the family unit, in Byron's favor. We agree. The trial court based its finding on Byron's history of living with his parents, but this finding overlooks critical evidence regarding Byron's future plans and the stability of his own relationships. Byron's pattern of serial intimate relationships reflects poorly on his judgment and stability, yet the trial court failed to comment on this salient evidence. Furthermore, the trial court made no findings with respect to how Byron's recent engagement will affect the permanence of his family unit. Introducing a stepmother into a child's life is a momentous event that could profoundly affect the child positively or negatively, but the trial court failed to consider how Byron's marriage will affect the child. Byron made a conclusory statement that his fiancé is willing to act as a coparent, but he did

not give any specific testimony regarding his plans for this transition. His fiancé did not testify. The trial court either failed to acknowledge the significance of Byron's engagement, or it implicitly assumed, without evidence, that Byron's fiancé appreciated the gravity of becoming stepmother to three young children with two different biological mothers. We conclude that the trial court erred in weighing in Byron's favor the factor concerning the permanence of the family unit.

Appellants argue that the trial court erred in finding that factor *vii*, Byron's mental and physical health, weighs in his favor, because Byron admitted that he has used marijuana. However, there was no evidence that Byron's marijuana use adversely affected his mental or physical health. Furthermore, the trial court had the opportunity to observe Byron and determine whether his appearance and demeanor raise any concerns about his health. Accordingly, the trial court did not clearly err with respect to this finding.

Appellants also argue that the trial court erred, with respect to factor *ix*, in finding that the child's relationship with his half-siblings should weigh in Byron's favor because, at this time, these children are strangers to Steven. However, the trial court could reasonably infer that the opportunity to know his half-siblings and grow up with them would be advantageous to Steven. We do not conclude that this finding is clearly erroneous.

Finally, although the trial court weighed factor *vi*, moral fitness, against Byron, appellants argue that the trial court erred in determining that his poor moral fitness did not outweigh the other factors. Appellants argue that the trial court clearly erred in determining that Byron had resolved his problems with marijuana, Vicodin, and improper alcohol use. They also emphasize

that Byron initially lied about using marijuana when his children were in his care.

We agree with appellants that evidence of Byron's self-reform was weak. The trial court's finding that Byron had remedied his marijuana use was based on Byron's testimony, which was hedged and equivocating. Similarly, Byron initially stated that he did not use marijuana around his children, but he later qualified this statement by saying, "Not while they were home. Maybe a couple times when they were asleep. But I would never do it when they were up or around or anything like that."

The trial court acknowledged that Byron's drug and alcohol use was "unacceptable," but concluded that Byron had "remedied" these problems. We are concerned that the primary evidence of Byron's reform was his own equivocal testimony. The trial court also commented favorably on Byron's plans to marry and to train as an electrician, but such planning was not competent evidence that Byron had left his drug use behind him. Nonetheless, the trial court had the opportunity to observe Byron's demeanor and evaluate his credibility; therefore, we cannot conclude that the trial court's finding is clearly erroneous. *In re BKD, supra* at 220.

In sum, the trial court did not clearly err in finding that the factors for capacity and disposition to provide love, affection, and guidance, and capacity and disposition to provide for the child's material needs, weighed in Byron's favor. There also was evidence to support the trial court's findings that the mental- and physical-health factor and a miscellaneous other factor (relationship with half-siblings) weighed in Byron's favor. The trial court clearly erred in finding that the permanence-of-family-unit factor favored Byron. The trial court did

not clearly err in finding that the moral-fitness factor did not outweigh the factors favoring Byron.[3]

We question whether granting Byron custody is truly in the child's best interest; contrary to the trial court's characterization, this case is certainly a "close call." However, the strong deference that is afforded to the trial court's weighing of evidence precludes the conclusion that the trial court clearly erred in deciding this question. The trial court found that Byron's casual drug use, unstable relationships, and dependency were less significant than his employment stability, parenting history, and plans for a more-stable future. The trial court did not clearly err in concluding that Byron's shortcomings were attributable to immaturity and amenable to improvement. We affirm the trial court's order denying the petition to terminate Byron's parental rights.[4]

### THE GRANT OF IMMEDIATE CUSTODY TO BYRON

Appellants further argue that, even if the best-interest decision was not erroneous, the trial court failed to comply with the Adoption Code when it ordered that Steven be immediately placed with Byron. Further, appellants contend that the trial court should have evaluated Zimmerman's fitness as a parent and

---

[3] Applying similar provisions of the Child Custody Act, MCL 722.23, our Court has reasoned that best-interest factors may be given relative weight in comparison to one another as the trial court finds appropriate under the facts and circumstances of a case. *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006). We conclude that this same approach is appropriate in weighing the best-interest factors under the Adoption Code.

[4] Had the trial court determined that granting custody of Steven to Byron was not in the child's best interest, an order terminating Byron's parental rights would have been required by the statute. See MCL 710.39 (discussed later in this opinion).

rendered a custodial decision based on the child's best interest with regard to both Zimmerman and Byron.

Whether the trial court followed proper procedure presents a question of law that is subject to review de novo. *In re CR,* 250 Mich App 185, 200; 646 NW2d 506 (2002). This issue also involves a question of statutory interpretation, which also is a question of law subject to review de novo. *In re RFF, supra* at 198.

The Adoption Code provides the procedure the trial court must follow when the natural father of a child born out of wedlock does not consent to the mother's plan to place the child for adoption. MCL 710.36(1) provides:

> If a child is claimed to be born out of wedlock and the mother executes or proposes to execute a release or consent relinquishing her rights to the child or joins in a petition for adoption filed by her husband, and the release or consent of the natural father cannot be obtained, the judge shall hold a hearing as soon as practical to determine whether the child was born out of wedlock, to determine the identity of the father, and to determine or terminate the rights of the father as provided in this section and sections 37 and 39 of this chapter.

MCL 710.39 provides, in pertinent part, as follows:

> (1) If the putative father does not come within the provisions of subsection (2), and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.
>
> (2) If the putative father has established a custodial relationship with the child or has provided substantial and regular support or care in accordance with the putative

father's ability to provide such support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with section 51(6) of this chapter or section 2 of chapter XIIA.

(3) If the parental rights of the mother are terminated pursuant to this chapter or other law and if the court awards custody of a child born out of wedlock to the putative father, the court shall enter an order granting custody to the putative father and legitimating the child for all purposes.

In *In re BKD, supra* at 216, this Court summarized the statutory classification of putative fathers under subsections 1 and 2 as follows:

[P]utative fathers who have "established a custodial relationship with the child," or who have "provided substantial and regular support or care," are entitled to the same legal protection of their parental rights as legal (i.e., married) fathers under the Adoption Code and fathers under the child protection provisions of MCL 712A.1 *et seq.* In contrast, fathers who have not supported their children, or otherwise established a paternal relationship, are subject to the loss of parental rights on a showing that termination is in the child's best interests.

The trial court found, and Byron does not contest, that he had not established a custodial relationship with the child and did not provide substantial and regular support or care for the mother or the child. Accordingly, the court followed MCL 710.39(1) and addressed the termination issue by evaluating the "best-interest-of-the-child" factors as defined in the Adoption Code, MCL 710.22(g).

Appellants argue that the trial court erred in granting custody of the child to Byron upon finding that

termination of his parental rights was not in the child's best interest pursuant to the statutory factors enumerated in MCL 710.22(g). They argue that the statute only allows a grant of custody to a putative father under MCL 710.39(3), which is limited to cases where the mother's parental rights have been terminated. Otherwise, they argue, the trial court must determine whether the child's best interest would be served by placement with the mother or the father. There are no published cases addressing the question of how custody should be decided where the mother does not release her parental rights and her petition to terminate the father's parental rights is denied.

The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature as expressed by the specific language of the statute. *In re RFF, supra* at 198. Where the language is unambiguous, it must be presumed that the Legislature intended the meaning clearly expressed, and no further judicial interpretation is permitted. *Id.* Judicial construction is justified when the statutory language is susceptible to more than one interpretation. *Id.* Because the Adoption Code is in derogation of the common law, it must be strictly construed. *Id.* at 199. Furthermore, when interpreting a statute, we must consider both the plain meaning of the critical word or phrase and its placement and purpose in the statutory scheme. *Gilliam v Hi-Temp Products, Inc*, 260 Mich App 98, 116; 677 NW2d 856 (2003). We must also read all sections of the statute together as a whole, and avoid a construction that renders part of a statute meaningless. *Sweatt v Dep't of Corrections*, 468 Mich 172, 183; 661 NW2d 201 (2003). Nothing may be read into a statute that is not within the manifest intention of the Legislature as expressed by the statutory language. *City of Monroe v Jones*, 259 Mich App 443, 450; 674 NW2d 703 (2003).

As appellants point out, subsection 3 is the only subsection of MCL 710.39 that directly makes any provision for an order granting custody to the father. It applies, however, only "[i]f the parental rights of the mother are terminated pursuant to this chapter" and, therefore, it is inapplicable to a situation like this, where the mother's decision to terminate her rights and place her child for adoption is contingent upon the trial court's determination that the parental rights of the father are to be terminated. Here, because of the trial court's decision not to terminate Byron's rights, Zimmerman has rescinded her decision to terminate her rights and subsection 3 does not apply.

Zimmerman contends that a court is without authority to grant custody to a father unless subsection 3 applies. We disagree. The subsection mandates that custody be granted to a father if its conditions are satisfied, but that does not mean that the subsection prohibits an order granting custody to the father in other situations.

Further, subsection 1 of the statute states that "the court shall inquire into [the father's] fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him." MCL 710.39(1). While not explicitly directing the court to grant custody to a father who is determined to be fit and able to properly care for a child whose best interest would be served by such a placement, the statute implies that granting custody in this situation is appropriate. Contrary to appellants' arguments, we do not conclude that the trial court erred in granting immediate custody to Byron once it had completed its "best interest" determination in his favor.

Further, we note that the trial court faced a difficult decision regarding who should have custody of Steven

once the best-interest determination had been made. Absent a reversal of the trial court's best-interest decision, it was clear that the Johnsons, the prospective adoptive family, could not maintain custody of Steven. An order allowing him to remain in their care would have only prolonged their attachment to Steven and exacerbated the pain they would experience when they had to relinquish him to another's care. Thus, the trial court had to decide which of the parents should receive custody from the Johnsons. Our Court has recognized that "the mother of a child born out of wedlock has made the decision to give birth to the child rather than have an abortion and, as a result of that decision, has carried the child in her womb for nine months." *In re RFF, supra* at 210-211. This is certainly a consideration to be weighed in favor of the mother in deciding a difficult question like that presented to the trial court here. However, in this case, Zimmerman had initially decided that she wanted to terminate her rights as a parent to the child she had carried and borne. Byron, notwithstanding his many faults and shortcomings, maintained that he wanted to act as Steven's father no matter what. We do not conclude that, in this situation, the trial court erred in deciding to grant immediate custody to Byron.

Further, we do not conclude that the trial court erred in failing to immediately conduct a full "best interest" determination regarding both parents to properly balance their competing claims for custody. This matter was filed under the Adoption Code and the hearing was specifically limited to determining whether Byron's rights as the father should be terminated. MCL 710.36(1). The "best interest" factors that the trial court properly considered under the Adoption Code specifically are to be considered only with regard to the

putative father of a child born out of wedlock, not also with respect to the child's mother. MCL 710.22(g).[5]

In contrast, the "best interest" factors in the Child Custody Act are to be considered by comparing each of the parents with the other. MCL 722.23. The trial court's decision here, under the Adoption Code, was clearly and properly premised on the fact that Zimmerman would have the opportunity for a further determination of the best interest of Steven under the Child Custody Act, where the court will weigh each of the parents on each of the factors before ordering a permanent custodial arrangement. The trial court did not err in deciding that, until that occurs, custody over Steven, "on a temporary basis," should be granted to Byron.

We affirm.

---

[5] And, of course, the court may not compare the putative father to the prospective adoptive parents in considering these factors. *In re Dawson*, 232 Mich App 690, 698-699; 591 NW2d 433 (1998).