# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* LJN, Minor.

UNPUBLISHED
August 18, 2015

No. 324256
Oakland Circuit Court
Family Division
LC No. 2014-817361-AD

LJN, also known as LJK,

          Appellee,

and

ELIZABETH ANN NELSON,

          Petitioner,

and

KIMBERLY ANN KELLY,

          Petitioner-Appellant,

v

WILLIAM FARMER,

          Respondent-Appellee.

*In re* LJN, Minor.

No. 324283
Oakland Circuit Court
Family Division
LC No. 2014-817361-AD

LJN, also known as LJK,

-1-

Appellant,

and

ELIZABETH ANN NELSON,

Petitioner,

and

KIMBERLY ANN KELLY,

Petitioner-Appellee,

v

WILLIAM FARMER,

Respondent-Appellee.

Before: SAAD, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

In this adoption case, the adoptive mother, petitioner Kimberly Kelly, appeals the decision of the trial court, which held that termination of respondent-father William Farmer's parental rights was not in the best interests of the child.[1] For the reasons stated below, we reverse the trial court's decision, and remand for entry of an order terminating Farmer's parental rights.

## I. FACTS AND PROCEDURAL HISTORY

## A. FACTUAL BACKGROUND

Farmer is 46 years old and has fathered seven children with five different women. He has known Nelson for 13 years, and has two other children with her. During the months before LJN was conceived, Farmer had a relationship with both Nelson and Amy DeVoe, who later became his fiancée. Nelson learned she was pregnant in August 2013, but did not inform Farmer of this fact. Over the course of her pregnancy, Nelson decided that she would give LJN up for adoption because she was "already struggl[ing]" to support and provide care for the two other

---

[1] LJN's guardian ad litem also appeals the trial court's decision on behalf of LJN. Elizabeth Nelson, LJN's birth mother, petitioned the trial court to terminate Farmer's parental rights, but she has not submitted an appeal.

-2-

children she had with Farmer.[2]  Though she was initially conflicted about giving up her child, Nelson visited an adoption center in February 2014.  She told an employee, Janis Weaver, that Farmer "was not helping with the other children and, therefore, with the third one [Nelson] was concerned about being able" to independently parent and provide financial support for LJN.

On February 24, 2014, soon after she gave birth to LJN, Nelson again met with Weaver and told her that she wanted to pursue adoption.  She also informed Weaver that she had not told Farmer about her pregnancy, and gave Weaver Farmer's address and what she believed was his phone number.  That same day, Weaver mailed a letter to the address and left a message at the phone number, in which she asked whether Farmer would cooperate with the plan for adoption.  In the meantime, Weaver helped Nelson complete a statement that transferred physical custody of LJN for adoption, and filed it in the Oakland Circuit Court on February 25, 2014.[3]  On the day after LJN's birth, Kelly, whom Nelson had selected as LJN's adoptive mother, took him home from the hospital.

On March 11, 2014, Kelly filed a petition for direct placement adoption.  That same day, Nelson asked the court to identify LJN's father and determine or terminate his parental rights to finalize the adoption.  Weaver, using a new telephone number provided by Nelson, spoke with Farmer on March 12, 2014.[4]  After Weaver told him of Kelly's intent to adopt LJN, Farmer became upset and said he would fight the adoption.  Weaver advised Farmer to speak with an attorney.  Sometime thereafter, Farmer called Weaver and reiterated that he did not want LJN to be adopted.  He also claimed to have hired an attorney,[5] but refused to give Weaver the attorney's contact information.  Because Farmer was abusive and irate throughout the call, Weaver eventually hung up on him.  Farmer received notice of the hearing to identify LJN's father on March 15, 2014.[6]

The trial court held a hearing on June 30, 2014 pursuant to MCL 710.39 of the Adoption Code.  It found that Farmer's claim to LJN was properly adjudicated under MCL 710.39(1), because Farmer did not have a custodial relationship with LJN, and had failed to provide substantial and regular support or care for LJN or Nelson.  See MCL 710.39(1) and MCL

---

[2] Nelson and Farmer's two other children live at Nelson's parent's home, because, although Nelson is employed, she is unable to afford her own home.

[3] Nelson chose to have an "open" adoption, which allows the biological parents to visit the child in the presence of the adoptive family.

[4] The letter Weaver sent to Farmer in late February was returned as undeliverable because of an incorrect address.

[5] It is unclear whether Farmer had actually obtained a lawyer at this time.  At the pretrial hearing on April 10, 2014, Farmer requested a court-appointed attorney because he lacked the financial resources to hire one.

[6] Farmer's identity as the father was confirmed by a paternity test, which the trial court permitted him to take at his request.  At the pretrial hearing, Farmer attempted to force Nelson to pay for part of the $300 paternity-test fee.

710.39(2).[7]  As such, the trial court took testimony as to whether termination of Farmer's parental rights was in LJN's best interests.

## B.  THE BEST INTERESTS HEARING

Under MCL 710.39(1), a trial court looks to the "best interests" of the child to determine whether a putative father's rights should be terminated.  MCL 710.22(g) defines "best interests of the child" to mean:

> . . . the sum total of the following factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date:
>
> (*i*)  The love, affection, and other emotional ties existing between the adopting individual or individuals and the adoptee or, in the case of a hearing under [MCL 710.39], the putative father and the adoptee.
>
> (*ii*)  The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee.
>
> (*iii*)  The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father, to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
>
> (*iv*)  The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
>
> (*v*)  The permanence as a family unit of the proposed adoptive home, or, in the case of a hearing under [MCL 710.39], the home of the putative father.

---

[7] None of the parties challenge the trial court's finding that Farmer's claim falls under MCL 710.39(1) on appeal.  However, petitioner Kelly argues the trial court erred in holding a best interests hearing because Farmer: (1) did not explicitly request custody of LJN; and (2) conditioned his "passive" custody request upon the results of a paternity test.  This argument is unavailing, because Farmer, in response to the hearing referee's question "[d]o you want the child in your custody," answered "[y]es, sir."  There is nothing in the plain language of MCL 710.39(1) that requires a putative father to "aggressively" (as opposed to "passively") request custody.  Likewise, Kelly's assertions that Farmer somehow acted improperly to stop the adoption proceedings are without merit.  In fact, the completion of the adoption proceedings requires a termination (or preservation) of Farmer's parental rights.

(*vi*)  The moral fitness of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father.

(*vii*)  The mental and physical health of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father, and of the adoptee.

(*viii*)  The home, school, and community record of the adoptee.

(*ix*)  The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court considers the adoptee to be of sufficient age to express a preference.

(*x*)  The ability and willingness of the adopting individual or individuals to adopt the adoptee's siblings.

(*xi*)  Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody. [MCL 710.22(g) (footnote omitted).]

In its determination of whether termination of Farmer's parental rights was in LJN's best interests, the trial court heard evidence relevant to each of the above factors.  In the sections below, we summarize the content of the best interests hearing and the trial court's ultimate determination in favor of Farmer.

## 1.  FARMER'S PARENTING HISTORY

Farmer has seven children with five different women, and has never been married to any of these mothers.  However, the state has declared him the legal father to four of his children: Brianna Farmer, Ebony McGhee, WF, and JF.  Farmer fathered the remaining three children, AN, JN, and LJN, with petitioner Nelson.  As of the best interests hearing, Brianna was 23 years old, Ebony was 20 years old, WF was 17 years old, and JF was 9 years old.

### 1A.  CHILDREN WITH WOMEN OTHER THAN PETITIONER NELSON

Though Farmer lived with Brianna for a period of time and has a positive relationship with her, Farmer acknowledged that he once owed Brianna's mother $30,000 in unpaid child support.  Despite the fact that Brianna's mother waived her claim to this unpaid obligation, Farmer owes the state of Michigan $20,000 on her behalf.  This is presumably because Brianna's mother required financial support from the state to compensate for Farmer's failure to provide assistance to her.[8]

---

[8] On October 30, 2013, Farmer was held in contempt of court in the Wayne Circuit Court and a bench warrant was issued for his arrest in connection with the unpaid debt.  Rather than face

Farmer's failure to pay child support—or provide meaningful financial assistance to his children and the mothers of his children—is a recurring theme in his parental relations. Ebony's mother waived her right to receive approximately $24,000 in child support from Farmer, but, again, Farmer owes the state $18,000 for the cost of Ebony's care, which he is repaying at a rate of $20 per month. Farmer has never lived with Ebony and has no relationship with her. And, though she is now a legal adult, Farmer is attempting to establish that Ebony is not his child, based on his apparent belief that he would be absolved of his financial obligations to the state if he had no legal connection to Ebony. There is nothing in the record to suggest that Farmer has spent any visitation time with Ebony.

Likewise, WF's mother is also owed $5,000 in unpaid child support.[9] Farmer is supposedly repaying this debt at $200 per month. However, he is attempting to stop the payments, because WF lived with him from April 2014 to June 2014. During the best interests hearing, WF split his time between Farmer's apartment and DeVoe's house in Allen Park. He anticipated living with DeVoe full time in the fall. WF was the only of Farmer's children to testify at the best interest hearing, and he stated that he had a "good bond" with his father. Farmer lived with WF and his mother through his infancy and early childhood, but left his mother's home when he was five or six. WF stated that he nonetheless continued to see Farmer frequently, including overnight visits on weekends and long stays during the summer. They also regularly spoke on the telephone. According to WF, Farmer also provided him with food and clothing, and ensured that WF visited the siblings with which Farmer had a relationship.

Between having AN and JN with Nelson, Farmer had his fifth child, JF, with another woman. Farmer has never lived with JF and his mother, nor is there anything in the record that demonstrates Farmer has spent any visitation time with JF.[10]

Farmer evinced a cavalier attitude with regard to his failure to meet his various child support obligations, and said he "d[id]n't feel that [he] owed them all that money" because he supposedly provided other financial support for his children, including food, clothing, rent, and car-maintenance money for the mothers of his children. As "icing on the cake," Farmer allegedly gave his children expensive gifts, including a moped, two motorbikes, two go carts, and three remote controlled helicopters.

---

arrest, Farmer turned himself in and set up a payment plan under which he pays the state $50 a month.

[9] The amount Farmer owes for WF's care is presumably less than the amount he owes for Brianna and Ebony's care because WF's mother did not seek child support until WF was 15 years old.

[10] Although not admitted into evidence in the lower court, petitioner Kelly notes in her brief on appeal that Farmer owes JF's mother approximately $5,800 in unpaid child support—and that the Genesee Circuit Court has apparently issued a warrant for Farmer's arrest in connection with this unfulfilled obligation. We cannot consider this evidence, however, because it was not presented to the lower court and litigants may not expand the record on appeal. *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 782 (2002).

## 1B. CHILDREN WITH PETITIONER NELSON

Despite the fact that he was present at AN or JN's births, Farmer has not been named the legal father of AN or JN, the two other children he has with Nelson. Nelson testified that, because of Farmer's extensive outstanding child support debts, she did not "see the benefit" in having him legally named as AN and JN's father, or trying to obtain child support from him. She also stated that, aside from gifts "here or there," Farmer never provided her with regular financial assistance for the children.[11] Nelson noted that Farmer did give her a Visa card, but that she used it to pay Farmer's bills, not to support AN or JN.

Farmer insisted that he gave the Visa card to Nelson to support AN and JN when he got out of prison in 2010. According to Farmer, the card was used to buy gifts for AN and JN for Easter, Christmas, and their birthdays, and to purchase their school supplies. Farmer had "girlfriends that went and shopped for me while I was at work . . . and picked up Easter stuff" for AN and JN. However, Farmer took the card away from Nelson a few months before she became pregnant with LJN because he believed she had a new boyfriend. Moreover, he did not give Nelson or the children any financial support during the 90-day period prior to receiving the notice of hearing to identify him as the father. Farmer explained this lack of financial support with reference to Nelson's supposedly greater ability to provide for AN and JN, because of the fact that she lives with her parents, and purportedly has no expenses besides a car note.

In terms of his relationship with AN and JN, Nelson characterized Farmer as an apathetic parent. Farmer has access to a vehicle, but only sees AN and JN if Nelson drives them to him. Similarly, Nelson must drive AN and JN to spend time with Farmer over the holidays or to see his side of the family. Farmer seemed to concede that he does not drive to see his children, but blamed his infrequent visits on timing and geographical distance. Moreover, after the trial court expressed confusion over how Farmer could be unaware of Nelson's pregnancy with LJN if he had been visiting AN and JN on a regular basis, Farmer claimed he had not seen his children in nine months, because "I haven't had time," and "[t]hings happened."[12] Though he remained in infrequent contact with Nelson, Farmer never pursued court action to ensure that he had regular contact with his children.

In any event, Nelson voiced concerns about Farmer watching JN, who suffers from a seizure disorder and ADHD, both of which require him to take medication three times a day. If he suffers from seizures in the night, he must be given a particular medication, which Farmer does not know how to administer. As a result, neither AN or JN stay overnight with Farmer unless Nelson is present. On prior occasions when JN was hospitalized, Farmer did not visit him.

---

[11] Nelson also pays for the children's health insurance through her work-based plan.

[12] Farmer and Nelson gave inconsistent testimony on when Farmer had actually seen AN and JN—Farmer variously said that he saw the children on a regular basis, had not seen them in over a year, or had not seen them in nine months. Nelson claimed that Farmer had last seen the children in October 2013, roughly nine months before the best interests hearing.

Likewise, Farmer never contributed any financial support toward LJN's care, and did not ask to see LJN after he learned that the baby had been born.[13] Nelson explicitly stated that she did not believe it was in LJN's best interests to live with Farmer because LJN would likely be raised by one of Farmer's girlfriends. She also noted that Farmer's past behavior with AN and JN indicated that he would not provide adequate care of LJN: "[Farmer] doesn't already take care of my two kids so why would he want to take care of—of this one."

## 2. FARMER'S CRIMINAL HISTORY

Farmer was charged with assault with a dangerous weapon, MCL 750.82, in 1995, but was found guilty of the lesser charge of "misdemeanor assault with a dangerous weapon." Farmer explained that the charge was the result of his sister "lying on me because she wanted a home." As part of the same 1995 incident, Farmer "got caught on [his] boat with a joint," and was convicted of possession of a marijuana pursuant to MCL 333.7403(2)(d). Between 2007 and 2008, Farmer was convicted of delivering and manufacturing marijuana, MCL 333.7401(2)(d)(*iii*), and of felony-firearm, MCL 750.227b, because he had an unregistered gun in his home. As a result, he spent approximately 30 months in prison between 2008 and 2010. Farmer attributed his convictions to a "scorned woman" who called the police and falsely reported that he was selling drugs out of his home. He admitted to smoking marijuana with friends when he was younger, but said he had stopped using the drug roughly a year before the best interests hearing.

## 3. FARMER'S FINANCES AND INCOME

Farmer lives in a two-bedroom apartment in Royal Oak and is employed as a steel hauler. By his own admission, Farmer made a "stipulation" to his employer upon his hire that he "wasn't going to work real hard," and, indeed, he worked only two to three days a week at the start of the adoption proceedings.[14] His annual income—between $24,000 and $26,000—reflects this paucity of working hours. Farmer lives paycheck to paycheck, and does not have a credit card, bank account, or savings. He also has not set aside any money for his children's educational needs.

We note that our mention of Farmer's small income and general lack of financial sophistication is not intended to create or support a general proposition that a parent's right to parent his child is put in jeopardy merely because that parent has a small income or lacks financial sophistication. Instead, these facts are relevant in the *specific context* of Farmer's case and are indicative of the choices he, as an *individual*, has made: namely, despite that fact that he has fathered many children with many different women, and has a responsibility to provide

---

[13] Farmer claimed that he did not ask about LJN because no one had told him that he could see the child. Weaver acknowledged that she did not tell Farmer that the adoption arrangement permitted visitation by the biological parents.

[14] After being admonished by the trial court for his rather leisurely work schedule, Farmer has apparently started working three to five days a week.

financially for these children, he has actively chosen not to do so, by (1) refusing to work a normal schedule that would increase his income and provide a better life for his children and (2) spending money on his own personal hobbies and interests to the detriment of his children and their mothers.[15]

### 4. FARMER'S CULTURAL AND RELIGIOUS BACKGROUND

Farmer believes that he is in a unique position to foster LJN's "cultural identity" because his family is supposedly connected to the Blackfoot Crow Indian tribe. However, Farmer could not confirm that he or any member of his family was a registered member of the tribe, or that the tribe exists. His assertion on this score also came as a surprise to Nelson, who told the hearing referee that LJN had no affiliation with any Indian group.

Equally unsupported was Farmer's self-identification as a Baptist who "sometimes" attends services at the Tabernacle Baptist Church. He could not name the pastor. Farmer does not take AN or JN to church because Nelson takes them regularly.

### 5. FARMER'S PLAN TO CARE FOR LJN

When asked about his plan to care for LJN, Farmer stated that the child has "two nice homes to go to," referring to his apartment and his fiancée's home. Farmer's fiancée, Amy DeVoe, lives in a three-bedroom house in Allen Park with her 10-year-old son and 12-year-old daughter. As noted, WF also stays at her house when he is not at Farmer's apartment and planned to live there full time to finish high school. At the time of the best interest hearing, Farmer and DeVoe were allegedly seeking to purchase a four or five-bedroom home in Belleville where they could combine their families, including LJN.

Although DeVoe "do[es]n't want to" raise children again, she discussed the issue with Farmer, and expected to play an active role in LJN's upbringing. She planned to take time off under the Family Medical Leave Act to establish a daily routine with the child. When DeVoe returns to work, Farmer expected her to watch LJN during the day, because she works mainly at night. For his part, Farmer voiced his intention to care for LJN at nighttime. He also claimed that he was willing to switch jobs and "make ways to care for [his] son." Additionally, Farmer would contribute toward LJN's care, as would DeVoe's three sisters and her mother, who live within four blocks of DeVoe's Allen Park home. DeVoe also had the opportunity to cut back on her work hours.

In the event that he and DeVoe part ways, Farmer insisted that he was "[a]bsolutely" able to provide for LJN on his own with the aid of his family: "I have kids; I have sisters; I have nieces. . . . I have a bi—a very big family. And I raised most of them."

---

[15] Despite his modest income, general lack of financial resources, and large amount of money owed in unpaid child support, Farmer has spent approximately $60,000 on repurposing a room in his apartment into a recording studio.

Nonetheless, the record indicates that DeVoe provides Farmer with both substantial financial support and health insurance. DeVoe, who earns roughly $80,000 annually, pays for many of Farmer's expenses from her own income. DeVoe explained that she and Farmer share a prepaid card in her name which they use to "pool [their] money together," and pay various bills.

DeVoe's largesse extends to Farmer's child support obligations: she is listed as the card holder and payor on receipts confirming that Farmer made such payments. She characterized paying Farmer's child support as her "womanly duty," while clarifying that, "I meant like, it's like there's certain things that like taking out the garbage, like, you know, certain things people take care of; the way we split things up in our household I guess." One other expense that DeVoe "take[s] care of" is health insurance, which Farmer receives through DeVoe's employer as her "domestic partner."[16] (Farmer fails to provide health insurance independently to any of his children.)

## C. THE TRIAL COURT'S DETERMINATION

In August 2014, after consideration of the above, the trial court ruled that termination of Farmer's parental rights was not in LJN's best interests, and issued an order that: (1) canceled LJN's placement with Kelly; (2) dismissed Kelly's petition to adopt LJN; (3) found that Farmer had parental rights; and (4) placed LJN with Nelson until she and Farmer could "appear before a court with proper jurisdiction to determine the physical and legal custody" of LJN.

Soon thereafter, Nelson filed an emergency motion for rehearing to reopen proofs, take new evidence, and stay dismissal of the adoption petition pending a hearing. Nelson claimed that Farmer sent her a text message after the best interest ruling which, in her view, demonstrated that he did not intend to take custody of LJN.[17] The trial court granted the motion, stayed the dismissal of the adoption, and held a hearing on the matter in late September, 2014. The trial court then entered an order denying Nelson's emergency motion, reinstating its prior orders, and directing that LJN be placed with Nelson through a "[g]radual transition from prospective adoptive mother to birth mother."[18]

---

[16] It is unclear whether Farmer is actually qualified to receive such coverage from DeVoe's employer. To obtain the insurance, Farmer and DeVoe signed an "affidavit for domestic partner benefits" on which they swore that they had been living together "in the same regular and permanent residence" for at least six months. Farmer acknowledged he was living in his Royal Oak apartment during the relevant period, but added that he was "over there [at DeVoe's house] a lot" and that his "mail goes there and everything else goe[s] there." DeVoe believed that she and Farmer had truthfully completed the affidavit because they had lived together regularly and permanently for at least six months, but had simply done so at two different residences.

[17] The text message indicated that Farmer wanted LJN to be with his biological family, but that Farmer would not have intervened if Nelson were raising him.

[18] As of oral arguments in this appeal, LJN was still living in Kelly's home.

On appeal, Kelly and the guardian ad litem argue that the trial court erred when it held that termination of Farmer's parental rights was not in LJN's best interests, because the trial court failed to address, among other things: (1) Farmer's tendency to have "serial, short-term relationships with multiple women, [which] produc[ed] seven children with five different mothers, none of whom he married or stayed with for very long"; and (2) Farmer's failure to pay child support and general inability (and reluctance) to financially provide for any of his children. Petitioners also assert that the trial court erroneously based its decision on: (1) Nelson's concealment of her pregnancy from Farmer; and (2) Farmer's supposed "constitutional right" to parent LJN.[19] Farmer asks us to uphold the ruling of the trial court.[20]

## II. STANDARD OF REVIEW

A lower court's decision to grant or deny a petition for adoption is reviewed for an abuse of discretion. *In re TMK*, 242 Mich App 302, 304; 617 NW2d 925 (2000). In an adoption setting, a trial court's findings of fact as to the child's best interests are reviewed for clear error. *In re BKD*, 246 Mich App 212, 215; 631 NW2d 353 (2001). "A finding is clearly erroneous if

---

[19] The guardian ad litem also makes the unpreserved claim that Farmer's unsubstantiated comments that he has Indian heritage required the trial court to send notice of the termination dispute to the Blackfoot Crow Indian tribe. See the federal Indian Child Welfare Act (ICWA), 25 USC § 1901 *et seq*. However, if the tribe with which the child or parent claims affiliation is not a tribe recognized as eligible to receive services from the Bureau of Indian Affairs, it is not an "Indian tribe" within the meaning of the ICWA. *In re Fried*, 266 Mich App 535, 539-540; 702 NW2d 192 (2005); see also *In re Morris*, 491 Mich 81, 100 n 10; 815 NW2d 62 (2012). Here, Farmer claimed affiliation with the Blackfoot Crow Indian tribe—which is not recognized as eligible to receive services by the Bureau of Indian Affairs. See 79 FR 4748-02 (January 29, 2014). Accordingly, the ICWA did not require the trial court to send notice to the Blackfoot Crow Indian tribe. *Id*.

[20] Farmer does not defend the trial court's finding that he had a constitutional right to parent LJN. This is likely because the trial court was simply wrong to so hold. A putative father has no rights concerning his alleged child until he either establishes: (1) legal paternity; or (2) a custodial or supportive relationship under MCL 710.39(2). See *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 193; 740 NW2d 678 (2007), and *In re BKD*, 246 Mich App at 221-222. If the putative father has not established a custodial or supportive relationship with the child, "the state may constitutionally terminate his parental rights through procedures and standards that are less stringent than those required to terminate the parental rights of a mother or a married father." *In re BKD*, 246 Mich App at 222.

Here, at the time of the best interest ruling, Farmer had not yet legally established paternity and remained LJN's putative father. Although he took a DNA test to demonstrate that he was LJN's biological parent, he never filed a claim under the Paternity Act (MCL 722.711) and it was undisputed that he had failed to establish a custodial relationship with LJN or a supportive relationship with Nelson. Accordingly, Farmer does not have a constitutional right to parent LJN and the trial court erred when it stated otherwise. See *Bay Co Prosecutor*, 276 Mich App at 193.

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009). Matters of statutory interpretation are a question of law, and are reviewed de novo. *In re RFF*, 242 Mich App 188, 195; 617 NW2d 745 (2000).

## III. ANALYSIS

When a putative father requests custody of a child pursuant to MCL 710.39(1), "the court shall inquire into [the putative father's] fitness and ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him." MCL 710.39(1). Again, MCL 710.22(g) defines "best interests of the child" to mean:

> . . . the sum total of the following factors to be considered, evaluated, and determined by the court to be applied to give the adoptee permanence at the earliest possible date:
>
> (*i*) The love, affection, and other emotional ties existing between the adopting individual or individuals and the adoptee or, in the case of a hearing under [MCL 710.39], the putative father and the adoptee.
>
> (*ii*) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father to give the adoptee love, affection, and guidance, and to educate and create a milieu that fosters the religion, racial identity, and culture of the adoptee.
>
> (*iii*) The capacity and disposition of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], the putative father, to provide the adoptee with food, clothing, education, permanence, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
>
> (*iv*) The length of time the adoptee has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
>
> (*v*) The permanence as a family unit of the proposed adoptive home, or, in the case of a hearing under [MCL 710.39], the home of the putative father.
>
> (*vi*) The moral fitness of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father.
>
> (*vii*) The mental and physical health of the adopting individual or individuals or, in the case of a hearing under [MCL 710.39], of the putative father, and of the adoptee.
>
> (*viii*) The home, school, and community record of the adoptee.

(*ix*) The reasonable preference of the adoptee, if the adoptee is 14 years of age or less and if the court considers the adoptee to be of sufficient age to express a preference.

(*x*) The ability and willingness of the adopting individual or individuals to adopt the adoptee's siblings.

(*xi*) Any other factor considered by the court to be relevant to a particular adoption proceeding, or to a putative father's request for child custody. [MCL 710.22(g) (footnote omitted).]

Here, the trial court clearly erred in its findings on two of these factors, which should have been dispositive in showing that it is in LJN's best interests to *terminate*, not preserve, Farmer's parental rights: MCL 710.22(g)(*iii*) (putative father's ability to financially support the child) and MCL 710.22(g)(*v*) (permanence of family unit in adoptive father's home).

As noted, Farmer has only recently opted for employment, and only at a part-time position. While a modest income might normally be sufficient to provide a suitable living environment and proper care for a child, Farmer owes a large amount of money to the state and other individuals in unpaid child support—debts which he initially refused to pay, and seeks, even now, to repudiate.[21] Moreover, he does not provide any of his children with medical insurance, and there is no reason to believe that he will do so for LJN. The trial court also heard extensive evidence that DeVoe, Farmer's current girlfriend, is paying for large amounts of Farmer's expenses, including his child support debt—but the court did not seriously consider how Farmer would provide for LJN independently of DeVoe, if Farmer and DeVoe eventually separate.

In light of Farmer's relationship history, such a scenario is a likely possibility and warrants consideration. As petitioners correctly note, Farmer is a womanizer who initiates "short-term relationships with multiple women, [which] produc[ed] seven children with five different mothers." Farmer himself testified to these proclivities: while Nelson was pregnant with JN, he was in another relationship with a different woman who was *also* pregnant, but this other woman decided to have an abortion. Over the course of his 13-year intermittent relationship with Nelson, Farmer conceived his fifth child, JF, with a different woman. Two of Farmer's prior engagements have fallen apart. After initiating his relationship with DeVoe, and temporarily ending that relationship, he returned to Nelson to try "the family thing," until she conceived LJN, at which point Farmer returned to DeVoe.

This pattern of "serial intimate relationships" reflects very "poorly on [Farmer's] judgment and stability." *In re Zimmerman*, 277 Mich App 470, 482; 746 NW2d 306 (2008), rev

---

[21] Specifically, as noted, Farmer owes the state roughly $43,000 in unpaid child support for the care of three of his seven children. Again, during the time that the child support arrearages accrued, Farmer spent approximately $60,000 to build a music recording studio in his apartment. This strongly belies Farmer's claims that he actually intends to responsibly parent LJN.

on other grounds 480 Mich 1143. It also shows him to be irresponsible and inconsiderate of the effects that his actions have on other individuals. In sum, Farmer's behavior and treatment of women indicates that he would not be a responsible father, and the trial court did not properly consider these failings when it held that termination of Farmer's parental rights was not in LJN's best interests. See *In re Zimmerman*, 277 Mich App at 482, and *In re BKD*, 246 Mich App at 219-220.[22]

## IV. CONCLUSION

The trial court clearly erred when it held that termination of Farmer's parental rights was not in the best interests of LJN, and it accordingly abused its discretion when it rejected Kelly's petition for adoption. We therefore reverse the holding of the trial court, and remand for entry of an order terminating Farmer's parental rights.

Reversed and remanded. We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro

---

[22] Because we reverse the trial court's determination of LJN's best interests with regard to MCL 710.22(g)(*iii*) and (g)(*v*), we need not address petitioners' claim that the trial court improperly considered Nelson's behavior in its determination of LJN's best interests pursuant to MCL 710.22(g)(*xi*).